No. 53,511

STATE OF KANSAS, *Appellee,* v. RICHARD MORGAN, *Appellant.*

(646 P.2d 1064)

Opinion filed June 11, 1982.

*Bruce E. Borders,* of Independence, argued the cause and was on the brief for the appellant.

*Jeffrey A. Chubb,* county attorney, argued the cause and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

*Roger C. Kidd,* of Wichita, was on the brief *amicus curiae* for the Kansas County and District Attorney Association.

The opinion of the court was delivered by

HERD, J.: This is an appeal from a conviction for aggravated robbery. K.S.A. 21-3427.

On August 18, 1980, at 12:35 p.m. Steve Coltharp, chief of police in Cherryvale, received an anonymous telephone call at the police station from what sounded like a middle-aged, Caucasian female. The caller stated that an accident had occurred out near the cemetery and the drivers of the cars were fighting. Coltharp went to the cemetery, which is two miles east of the Town and Country Market, and found no such accident and no fight. Upon arriving back at the police station at 12:50 p.m., Coltharp received another telephone call, this one from the Town and Country Market, advising him they had just been robbed. The robbery occurred while Coltharp was investigating the false tip from the anonymous caller.

Sheila Milam was cashier at the Town and Country Market on the day of the robbery. Between 12:00 noon and 1:00 p.m. on that day she was approached by a man with a gun who demanded money. The man was described as middle-aged, wearing brown pants and a checkered shirt. His hair was black with streaks of silver and he had a bandaid on his face. Milam stated the robber was in a hurry and almost ran into George Montgomery while leaving the store.

Montgomery testified he had been in the Town and Country Market just after 12:30 p.m. on August 18, 1980. While he was in the store a man he described as wearing brown slacks and a checkered shirt, with a bandaid on his cheek and sandy grayish hair, brushed past him. Montgomery proceeded to the checkout stand where the crying Sheila Milam informed him she had just been robbed. Montgomery identified the appellant at trial as the man he had seen in the store on the day of the robbery.

Sue Johnston, an employee of the Town and Country Market, was in the parking lot of the store between 12:00 noon and 1:00 p.m. on August 18, 1980. She observed a man with a bandaid on his cheek run out of the store and climb into a green Pontiac. Johnston thought perhaps the man was a shoplifter. Johnston left the parking lot in her vehicle and proceeded south on U.S. Highway 169. She stopped to talk to her son along the highway in town, and while there she was passed by the vehicle she had seen

in the parking lot. Johnston described the vehicle as a green Pontiac with a California license plate; she believed the license number contained 9's and 0's. She testified when shown State's exhibit number four, California license plate 909 WKX, she believed it could have been the tag she saw. Her observations were reported to Chief Coltharp.

At about 1:20 p.m. on the same day, County Commissioner Ray Caldwell was on his way home from a commission meeting. He had just heard an announcement on KGGF radio that the Town and Country Market in Cherryvale had been robbed by an armed robber and that a green Pontiac with California plates was involved. At that point, Caldwell observed a green Pontiac with California license number 909 WKX headed south on Sunflower, a county road. Caldwell followed the vehicle to a rural farmhouse. He called the sheriff and proceeded back to the driveway of the farmhouse to wait for the law enforcement people.

Sheriff Art Schenk and members of his department were notified of Caldwell's observations. Since they had already been advised of the armed robbery, they were out patrolling the county roads. Schenk and his deputies proceeded to the farmhouse and surrounded it. They soon took its three occupants, appellant, his wife and son, into custody. Sheila Milam was brought to the farmhouse for an attempt at identifying the appellant. She was crying and shaking and hid behind deputies when asked to look at the appellant. She was unable to make the identification, explaining later that during the robbery she looked primarily at the weapon. The appellant and his wife and son were then incarcerated.

In due course appellant was tried and a jury convicted him of aggravated robbery. He appeals.

Appellant first contends his warrantless arrest was improper and the evidence obtained from the farmhouse subsequent to the arrest, including the money, gun and license plates, should therefore be suppressed.

After Commissioner Caldwell notified authorities of his observations, the farmhouse was surrounded. A deputy observed Barbara and Rick Morgan, appellant's wife and son, in back of the house, along with the green Pontiac. The sheriff then shouted for everyone in the house to come out. Appellant, his wife and son followed his order and surrendered. The house was checked for

other persons. No one else was found. A search warrant was then obtained and the house was searched and evidence seized.

There is no contention the search itself was unlawful. Appellant argues only the arrest was improper and any subsequent evidence obtained is inadmissible. K.S.A. 22-2401 states: "A law enforcement officer may arrest a person when . . . . (c) He has probable cause to believe that the person is committing or has committed (1) A felony . . . ." "Probable cause for arrest without a warrant depends upon the probabilities arising from known facts and circumstances and exists when the practical considerations of everyday life would lead a reasonable and prudent officer to believe a felony has been or is being committed." *State v. Brocato*, 222 Kan. 201, 203, 563 P.2d 470 (1977).

There is obviously ample evidence to support a finding of probable cause for arrest. The officers had evidence a person driving the getaway car was in the farmhouse. Further, they had a description of the robber which matched Morgan at the time he surrendered. There is no merit to appellant's contention.

Appellant next maintains the district court erred in admitting into evidence a statement made by him to the county attorney outside the presence of defense counsel.

Appellant's first appearance before the Montgomery County District Court came on August 19, 1980, the day after the robbery. At that time counsel was appointed. During the first appearance appellant made statements to the effect he had committed the crime, that he would take the blame for it and his wife and child should go free.

Immediately following his first appearance, while still in the courtroom, Morgan requested to be taken to the county attorney so he could give a complete statement. He was immediately escorted to Montgomery County Attorney Paul Oakleaf's office where he was administered a *Miranda* warning. He waived his right to remain silent and have counsel present. He had not yet consulted his court-appointed attorney. Subsequent to the waiver, Morgan gave a statement implicating himself in the robbery. The statement was later introduced in evidence at trial over appellant's objection.

It should first be noted appellant is not claiming the statement he made to the county attorney was not given voluntarily. Nor is there an allegation his *Miranda* rights were violated. He does

contend, however, that in talking with Morgan outside the presence of defense counsel, the county attorney violated DR 7-104(A)(1) of the Code of Professional Responsibility and that evidence taken in violation of this rule should have been suppressed. DR 7-104(A)(1) (228 Kan. cxv), states:

"During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in the matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

The contested issue has been dealt with by various state and federal courts. Appellant relies mainly on the 10th Circuit case *United States v. Thomas,* 474 F.2d 110 (10th Cir.), *cert. denied* 412 U.S. 932 (1973). There the defendant was charged with several violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970. Defense counsel was appointed September 22, 1971. On October 18, 1971, a narcotics agent obtained a statement from defendant in the absence of and without the knowledge of defense counsel. The court noted the unethical conduct of the prosecution in attempting to use the statement in question. It also agreed with the defendant that DR 7-104(A)(1) was applicable in both civil and criminal cases. The court then held:

"[O]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think, would be to overlook conduct which violated both the letter and the spirit of the canons of ethics. This is obviously not something which the defendant alone can waive.

"A violation of the canon of ethics as here concerned need not be remedied by a reversal of the case wherein it is violated. This does not necessarily present a constitutional question, but this is an ethical and administrative one relating to attorneys practicing before the United States courts." 474 F.2d at 112.

*Cf. United States v. Crook,* 502 F.2d 1378 (3rd Cir. 1974), where the court held the federal statute requiring a trial judge to admit into evidence a statement made voluntarily controlled over the provisions of the Code of Professional Responsibility.

More recently a federal district court has provided some rationale for the *Thomas* ruling. In *United States v. Batchelor,* 484 F. Supp. 812 (E.D. Pa. 1980), the court held that in a situation such

as that in the case at bar the government's argument the defendant waived the presence of counsel is irrelevant because DR 7-104(A)((1) does not contemplate waiver. The court noted "the important societal interest at stake in insuring that laypersons not make decisions of major legal implication without the advice of counsel." As such "the Rule to some degree promotes values of constitutional dimension." 484 F. Supp. at 813.

This court has never considered the specific question raised. In *State v. Johnson,* 223 Kan. 237, 573 P.2d 994 (1977), the defendant voluntarily made statements to an undersheriff outside the presence of his appointed counsel. The court quoted the two paragraphs from *Thomas* set out above, but then stated at page 243:

"This court has held, under somewhat different circumstances, that failure to have counsel present does not 'ipso facto' make a defendant's statement involuntary. [Citations omitted.]

" 'An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he has previously retained counsel does not necessarily make inadmissible a voluntary statement made by the defendant in his counsel's absence.' "

More recently, in *State v. Costa,* 228 Kan. 308, 314, 613 P.2d 1359 (1980), we held:

"An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he has previously retained counsel does not necessarily make inadmissible a voluntary statement made by the defendant in his counsel's absence."

The Colorado appeals court touched on the issue and has seemingly followed the same rule as this court. In *People v. Pierson,* _____ Colo. App. _____, 633 P.2d 485 (1981), it stated:

"Thus, it is our view that once a criminal defendant has either retained an attorney, or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered into evidence for any purpose unless the accused's attorney has been notified of the pending interview and given a reasonable opportunity to be present [citation omitted], or unless the defendant has *expressly* waived his right to have his attorney present during the specific questioning session at which the statement is obtained." p. _____. 633 P.2d 488.

A well-reasoned and detailed discussion of the problems raised by appellant's contention can be found in *People v. Green,* 405 Mich. 273, 274 N.W.2d 448 (1979). There the facts were essentially the same as the case at bar. Defendant made a statement in the presence of the assistant prosecuting attorney which was used

against him at trial. On appeal he did not argue the authorities failed to comply with *Miranda* but that the assistant prosecutor had violated DR 7-104(A)(1) and as such the statement should be inadmissible.

The court unanimously agreed the assistant prosecutor violated the Code of Professional Responsibility. On the issue of whether the statement should be suppressed because of this misconduct the court split four to three. The majority opinion stated:

"The defendant has argued that the violation of DR 7-104(A)(1) was a violation of his rights and that unless his statements are suppressed, he will have no effective remedy to redress the wrong done to him.

"This argument rests upon a basic misconception of the Code of Professional Responsibility. The provisions of the code are not constitutional or statutory rights guaranteed to individual persons. They are instead self-imposed internal regulations prescribing the standards of conduct for members of the bar. Although it is true that the principal purpose of many provisions is the protection of the public, the remedy for a violation has traditionally been internal bar disciplinary action against the offending attorney. The sanctions available are by no means trivial. The attorney faces permanent disbarment. In these respects the provisions of the code are no different from the provisions found in the codes of conduct for other professions, such as medicine or architecture. They are all self-governing in-house regulations.

"The admissibility of evidence in a court of law, on the other hand, is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions." 405 Mich. at 293-94.

The opposite view is found in *People v. Hobson,* 39 N.Y.2d 479, 481, 348 N.E.2d 894 (1976), where the court held:

"Once a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer [citations omitted]. Any statements elicited by an agent of the State, however subtly, after a purported 'waiver' obtained without the presence or assistance of counsel, are inadmissible."

Here there was clearly a violation of DR 7-104(A)(1) which cannot be condoned. Neither can we permit a defendant to waive an ethical violation, thereby allowing admission of evidence obtained in violation of the Code. It is not a right secured to him to waive. The prosecutor is a lawyer first; a law enforcement officer second. The provisions of the Code of Professional Responsibility are as applicable to him as they are to all lawyers. We agree with the Michigan court, however, that the function of the Code of Professional Responsibility is to prescribe the standards

of conduct for members of the bar. The provisions of the Code are unrelated to the admission of evidence. We therefore adopt the Michigan rule and hold the trial court did not err in admitting the evidence adduced by the prosecutor. Sanctions for violation of DR 7-104(A)(1) are irrelevant to this case.

Appellant next argues it was error not to discharge prospective jurors when he appeared briefly before them in jail garb.

On February 24, 1981, the first day of trial, the appellant was brought from the county jail to the courtroom without having changed into civilian clothes. At that time the prospective jurors were sitting in the courtroom. The clothes Mr. Morgan was wearing were described by the judge as follows:

"[W]hite short-sleeved shirt with two breast pockets and a nameplate tag type of cloth—type of cloth nameplate that you see in mechanic's garages, other places that usually have the name on it, and either that or the name of the firm. But, in this particular case it does have the letters M.P. and the letters are large, but the lines are thin. The trousers are blue. The defendant is wearing black socks and kind of a chukka boot, three-quarters height desert boot type thing, suede leather. They are worn, but they're not in tatters. They are not excessively worn, in other words. I see there are no numbers visible on the uniform that I can see."

Prior to juror selection appellant moved the court to discharge the prospective jurors. The judge denied the motion finding appellant was not prejudiced by his appearance in jail clothes. Before the trial started, however, civilian clothes were obtained for Mr. Morgan to wear. The trial judge offered to admonish the jury but defense counsel made no such request. Voir dire was then conducted and defense counsel never inquired of the jury panel whether any of the prospective jurors had noticed the jail clothing or had been prejudiced by it.

This case is directly in point with *State v. Hall*, 220 Kan. 712, 556 P.2d 413 (1976). There, prior to jury selection the defendant appeared in jail garb. Defense counsel moved for a mistrial. The trial judge denied the motion but declared a recess and allowed the defendant to obtain civilian clothing. The trial then resumed. This court affirmed, noting "the appearance of an accused in prison garb at a trial or some portion thereof, does not in and of itself constitute reversible error. It must be shown that the accused was prejudiced by such appearance in that such appearance resulted in an unfair trial." 220 Kan. at 715.

Here there was no showing of prejudice by the appellant. The trial court's ruling was proper.

Appellant finally argues the evidence was insufficient to support a conviction for aggravated robbery. This court in *State v. Carr,* 230 Kan. 322, 326, 634 P.2d 1104 (1981), recently noted the oft-repeated standard of review on appeal for determining whether evidence is sufficient to support a conviction: "Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt?" Clearly the great amount of evidence against appellant, including an eyewitness identification, is sufficient to support his conviction. The fact that the clerk at the store, who was frightened and stared primarily at the robber's gun, could not identify Morgan does not detract from this conclusion.

The judgment of the trial court is affirmed.