No. 56,935

STATE OF KANSAS, *Appellee,* v. JACK L. PURSLEY, *Appellant.*

(710 P.2d 1231)

Opinion filed December 6, 1985.

*Charles A. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, argued the cause, and *Ernest L. Tousley*, of the same firm, was with him on the brief for the appellant.

*Morgan Metcalf*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal case by the defendant, Jack L. Pursley, from his conviction of first-degree murder (K.S.A. 21-3401) following a jury trial in Butler County. The defendant raises three issues on appeal. He claims the trial court erred by overruling his motion to suppress his confession, by denying his motion for mistrial due to prosecutorial misconduct in the closing argument, and by denying his motion for mistrial based on the prosecutor's comments on the defendant's right not to take the stand in his own behalf.

On December 21, 1982, at approximately 4:00 p.m., Lawrence Hay was found shot to death in his home near Douglass, Butler County, Kansas.

During the early portions of their investigation, officers of the sheriff's department learned that on December 20 and 21, the defendant had some "unusual" conversations at odd hours with Frank Becker, Jerry Hill, and Eddie Dean in which he had talked of a "duel" he was to be involved in. He indicated that the duel was to be with an individual whose last name began with an "H" who lived near Douglass, Kansas. The sheriff's officers also learned that Pursley was a friend of Hay's and had been to his home on the evening of December 20. Based on this information, Pursley was arrested on December 21 under suspicion of murder.

Prior to his arrest, Pursley had been living with his fiancee, Sara Stephens, and had been operating his own scaffolding business.

At 2:00 a.m. on December 20, the defendant phoned an El Dorado police officer, Jerry Hill, for whom he had once done

some undercover police work, and asked Hill to meet him in a remote location. Hill met with the defendant, who was armed with an unloaded revolver. The defendant told Hill of a schoolteacher who he believed was dealing in narcotics. The defendant said he planned to "smoke" this person.

On the night before the shooting, December 20, the defendant went to Larry Hay's house to watch the Monday night football game with him. Rebecca Laughlin, who was living with Larry Hay, testified that Larry told her the defendant had asked him to go out drinking after the game, but Larry turned him down. The defendant testified that while he was at Hay's house they agreed they would have to have a duel (the reason is unclear). Hay told the defendant to check back the next day on the time and place for the duel.

About 3:00 a.m. on December 21, the defendant phoned Frank Becker, an El Dorado banker for whom his fiancee worked, and said he urgently needed to meet with him. Becker agreed that the defendant could come over to his house to talk. He talked with Becker of the Mafia, the secret service, and of a "confrontation" he was to have in which there would be only "one survivor." Becker recalled the defendant said the confrontation was to take place near Douglass. He could not remember the name of the other participant, except that it started with the letter "H."

Following this meeting with Becker, the defendant phoned his friend, Eddie Dean, and said he needed to talk to him. In their conversation, the defendant told Dean that he was involved with the Mafia and that he was to be in a "duel."

On the night the defendant was arrested, at about 11:00 p.m., the police officers conducted their first interview with him. At that time, the defendant signed a waiver of his *Miranda* rights. He then denied being at Hay's home earlier that day, and claimed he knew nothing of Hay's death. When asked about the revolver he had been carrying, the defendant turned, stared toward the wall, and would say nothing else.

On December 22 at 10:30 a.m., the defendant was again interviewed after he orally waived his *Miranda* rights. The defendant changed his previous statement by admitting he had been at Hay's home on December 21, but that no one had been

home. When he was asked specifically if he had shot Hay, the defendant requested a chance to think.

The defendant was granted his request and sent back to his cell. Forty-five minutes later he was re-questioned after again being advised of his *Miranda* rights. However, the defendant made no further statement.

Later that day, Dr. Girod, an El Dorado physician, visited the defendant for purposes of determining his mental condition and whether he was dangerous to himself or others. His evaluation was used as a basis for the filing of an incompetency petition against the defendant on December 23. That petition was dismissed on December 28.

During the evening of December 22, the defendant was allowed to confer with an attorney, Charles Green. They talked for 25 minutes. The defendant also met with Green the next morning.

At around noon on December 23, Eddie Dean came to the jail to visit the defendant. During their conversation, the defendant admitted shooting Larry Hay. Dean asked the defendant if he wanted him to tell the sheriff. The defendant agreed. He subsequently gave a confession to the police after being advised of and waiving his *Miranda* rights.

According to the defendant's statement, when he pulled up in front of Hay's house on the afternoon of December 21, Hay had come out of the house waving a sawed-off shotgun at the defendant. The defendant fired a couple of shots from his revolver in Hay's direction, missing both times. A struggle ensued during which the defendant took the sawed-off shotgun away from Hay. The struggle moved into the house as Hay tried to make his way to another gun. Defendant then aimed the shotgun at Hay. Hay yelled, "My God, Jack, that gun is loaded." The defendant then, in his words, "squeezed one off." The defendant said that afterwards he had fled because he was scared. He dumped the guns somewhere on his way back to El Dorado.

According to testimony at trial, there were no signs of struggle at the Hay residence.

Although a search was conducted, the murder weapon was never located.

The defendant initially contends the trial court erred by overruling his motion to suppress his confession to his friend, Eddie Dean, and his subsequent confessions to the police. The de-

fendant argues that the confessions should have been suppressed for a number of reasons, including: the defendant was not mentally competent at the time of the confession and, therefore, did not voluntarily waive his rights; the defendant was not informed of his *Miranda* rights prior to his conversation with Eddie Dean; the defendant did not effectively waive his right to counsel before making his statement to the police officers; and the county attorney acted unethically in procuring the defendant's confession.

The defendant first argues that any statement he gave on December 23 was involuntary because of his mental status. At the time these statements were made, an incompetency petition (K.S.A. 59-2913) was pending against the defendant. This petition was based on Officer Ron Morrison's belief that the defendant was dangerous to himself and to others (Office Morrison had been present during each interview of the defendant), and on Dr. Girod's evaluation in which he concluded that although the defendant was "definitely not psychotic" he was paranoid and capable of unpredictable behavior, including violence.

Toward the end of defendant's second statement to the police, the defendant stood, said something in broken Spanish, and then declared, "let there be peace in our village." Immediately after making his confessions on December 23, the defendant talked to his mother and sister and told them he had told the officers what they wanted to hear. He also told his mother there would be a quick conviction and he would then apparently be sent to Lansing but would not actually go there; instead his "face would be changed" and he would be sent away to continue his undercover work for the CIA.

The defendant argues that under these circumstances, he was not mentally competent to voluntarily waive his *Miranda* rights and to understand the significance thereof.

The evidence in this case is undisputed that the defendant was properly advised of his *Miranda* rights and no threats or promises were made to him. The defendant told the court reporter prior to giving his statement that he was "all right" and said, "I know what I'm doing." The defendant then gave a detailed statement to police in which he admitted he had shot Larry Hay.

In reaching its conclusion on the defendant's motion to suppress due to his mental incompetency, the trial court considered

the following factors: the defendant's conversations with Frank Becker, Jerry Hill and Eddie Dean prior to the shooting; his unusual behavior during his first interview with the police following their questioning him about his gun; the filing of the incompetency petition; Dr. Girod's evaluation; the police officers' impression that the defendant was improved and was responsive and cooperative when he confessed; the defendant's statement to the court reporter that he knew what he was doing; defendant's bizarre declaration at the end of his second statement; defendant's statements to his mother on December 23; defendant's psychologist's opinion that the defendant did not know what he was doing when he confessed; the State's psychiatrist's opinion that the defendant did know what he was doing when he confessed. The trial court concluded that although the defendant had displayed some unusual behavior, under the "totality of the circumstances" the defendant had failed to overcome the presumption that he was sane. The court therefore refused to suppress on this ground.

In a criminal case there is a presumption of sanity, and if the accused attacks the voluntariness of his confession on the ground of mental incompetency at the time the confession was given it is incumbent that he overcome the presumption by substantial competent evidence to substantiate his claim. *State v. Gilder*, 223 Kan. 220, 574 P.2d 196 (1977).

In *State v. Boan*, 235 Kan. 800, 804, 686 P.2d 160 (1984), this court stated:

"The question as to the effect of mental illness on the voluntariness of a confession has been before this court on several occasions. In *State v. Pyle*, 216 Kan. 423, 440, 532 P.2d 1309 (1975), it was held that the test for determining whether a suspect has the mental capacity to make a voluntary confession is the same as the test for determining his criminal responsibility for committing the crime. In absence of insanity meeting the *M'Naghten* test, the mental condition of a defendant at the .time he makes a statement is relevant to the issue of voluntariness but is not necessarily conclusive; its weight is for the trier of fact. A trial court's finding, after a *Jackson v. Denno* hearing, that the defendant was sane and made his confessions knowingly and voluntarily is binding on appellate review if supported by substantial competent evidence. More recent cases in accord with this position are *State v. Gilder*, 223 Kan. 220, 574 P.2d 196 (1977); *State v. Buckner*, 221 Kan. 117, 120, 558 P.2d 1102 (1976); *State v. Wright*, 219 Kan. 808, 549 P.2d 958 (1976)."

In the instant case, three experts testified at trial as to defendant's mental status at the time of the crime and at the time of the

confession. Only the defendant's psychologist testified that the defendant was criminally insane. He diagnosed the defendant as a paranoid schizophrenic. However, he was unable to conclusively state that the defendant did not know right from wrong during the crucial period. He also admitted that the results of one of the tests which he administered to the defendant indicated that he was not suffering from paranoid schizophrenia.

On the other hand, the State's experts—a psychiatrist and a psychologist—testified that the defendant was sane both on the day of the killing and the day he confessed. They opined that although the defendant suffered from a mental disturbance, he did know right from wrong, and he appreciated the nature and seriousness of his behavior. Also, Dr. Girod, who examined the defendant prior to the filing of the incompetency petition, concluded he was "definitely not psychotic. His thinking is coordinated, rational and coherent. There is no indication of mental impairment or mental defect."

The police officers and Eddie Dean testified that the defendant's condition was apparently improved at the time he confessed. Moreover, the defendant, in his statements to the police, described the events surrounding the killing in great detail.

Under all the circumstances, we find there was substantial competent evidence to support the trial court's finding that the defendant did not overcome the presumption of sanity. Accordingly, we find the trial court did not err by finding the confession was voluntary and by refusing to suppress on the basis of the defendant's sanity.

The defendant next contends the trial court erred by refusing to suppress his confession to Eddie Dean because the conversation was tantamount to a custodial interrogation and he had not been advised of his *Miranda* rights.

The *Miranda* warning was designed to protect a putative defendant against the compulsion to incriminate himself arising from an official custodial interrogation. *Battie v. Estelle*, 655 F. 2d 692 (5th Cir. 1981). A "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody." *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966); *State v. Frizzell*, 207 Kan. 393, Syl. ¶ 1, 485 P.2d 160 (1971). Therefore, the requirements of *Miranda* apply only when the suspect is interrogated by

law enforcement officers or their agents. *United States v. Parr-Pla*, 549 F.2d 660 (9th Cir. 1977). Conversely, the *Miranda* rules do not apply to situations where the suspect makes incriminating statements to a private citizen who is not an agent of law enforcement officers. *State v. Stuart*, 205 Kan. 174, 468 P.2d 240 (1970); *State v. Little*, 201 Kan. 94, 439 P.2d 387 (1968).

In this case, Eddie Dean was a friend of the defendant's, having known him socially for three to four years prior to December 1982. From 1968 until 1973, Dean worked for the Department of Public Safety in El Dorado. Although he no longer worked there in 1982, he and the sheriff had remained friends. Also, in 1980, Dean had recommended to Captain Jerry Hill that the defendant would be a good undercover agent for the El Dorado police. He later introduced the defendant to Captain Hill.

In the early hours of December 21, 1982, the defendant called Dean and said he had to talk with him. They met and the defendant talked of the Mafia and his upcoming duel. The next day, Dean contacted Captain Hill, Sara Stephens (defendant's fiancee), and Frank Becker to talk over the implications of his conversation with the defendant. Also on December 21, Dean phoned a psychiatrist through a mental health center hot line and told him about the defendant. The doctor advised Dean that the defendant might be dangerous and that he should contact the police. Thereafter, Dean called Officer Morrison at the sheriff's department and together they determined that the defendant might be connected with the shooting death of Larry Hay.

Around noon on December 23, Dean went to the sheriff's office in order to talk with the defendant. He testified that his reason for wanting to talk with the defendant was that he was curious as to what had happened. He asked the sheriff's permission to see the defendant. The sheriff checked with the county attorney and with the defendant, both of whom agreed to the visit. Dean also testified that before he saw the defendant, the sheriff told him, "So there'll be no misunderstanding, I'm not asking you to talk to the defendant."

Eddie Dean told the defendant that he was upset about what had happened, that something must have made him do what he did, that he felt he could have prevented it and that he really wanted to know what had happened. The defendant then pro-

ceeded to describe the shooting and the events surrounding it. Dean then said, "Jack, I am the only one that knows it, except—you and I are the only ones that know. What should we do from now on? Do you want me to talk to the Sheriff?" The defendant said he did. He subsequently gave a full confession to the police.

Following the suppression hearing, the trial court concluded that Dean was not an agent for law enforcement and that the defendant's conversation with Dean was neither instigated nor initiated by any law enforcement officer. Therefore, the trial court concluded that no *Miranda* warnings were required and refused to suppress the defendant's statement to Dean.

In order to have established the existence of an agency relationship, the defendant would had to have shown that the officers intended Dean to act on their behalf, and also that Dean intended to accept the authority delegated to him. See *United States v. Henry*, 447 U.S. 264, 65 L.Ed. 2d 115, 100 S.Ct. 2183 (1980). The United States Supreme Court has found an agency relationship existed when a fellow inmate of the accused was a paid government informant, *United States v. Henry*, 447 U.S. 264, and when a psychiatrist was court-appointed. *Estelle v. Smith*, 451 U.S. 454, 68 L.Ed. 2d 359, 101 S.Ct. 1866 (1981).

The United States Court of Appeals for the Seventh Circuit recently determined that an accused's older brother, whom police had placed in the accused's jail cell with the knowledge that the brother planned to talk the defendant into confessing, was not an "agent of law enforcement" and, therefore, the resulting confession was not the product of a custodial interrogation. *United States ex rel. Church v. De Robertis*, 771 F.2d 1015 (7th Cir. 1985). For other cases dealing with when an agency relationship with law enforcement exists, see Annot., 31 A.L.R. 3d 565, 647-76.

The record in this case reveals that Eddie Dean talked with the defendant on his own initiative. The authorities did not plant in Dean's mind the notion to persuade the defendant to confess. Nor did the police initiate the idea of a consultation with the defendant. They provided only the opportunity for Dean to confer with the defendant. The spontaneous confession that resulted was the work of the defendant's friend, not of custodial interrogation. The fact that Dean had once been a police officer is irrelevant.

Therefore, we hold that Eddie Dean was not an agent of the State, and, as such, no *Miranda* warnings were required before he talked with the defendant. Accordingly, we find the trial court did not err by refusing to suppress the defendant's statement to Dean.

The defendant next contends that he had not effectively waived his Sixth Amendment right to counsel prior to confessing to the police, and, therefore, the trial court erred in refusing to suppress his statements to the police on December 23.

At around noon on December 23, Sheriff Williams received a call from Charles O'Hara in Wichita, informing him that O'Hara had been retained by defendant's mother to represent the defendant, and that he would arrive in El Dorado to visit with the defendant at or about 2:00 that afternoon. At the time of the phone call, the defendant was talking with attorney Charles Green. The sheriff phoned the county attorney to inform him of O'Hara's call. The county attorney expressed that he had thought Green was the defendant's attorney. The sheriff then interrupted the meeting between the defendant and Green to inform them of O'Hara's message. The sheriff told Green that under the circumstances, Green should leave.

Green did leave, and at 12:30, Dean arrived and had his conversation with the defendant. Following this, Dean informed the sheriff that the defendant wanted to make a statement. The defendant was advised of and waived his *Miranda* rights. He then gave a statement in the presence of the sheriff, Officer Morrison, and Dean. This was at 1:00. After being re-advised of his *Miranda* rights and again waiving the same, the defendant gave a second statement at 2:00, which was recorded by the court reporter and heard by Dean, Williams, and Morrison. The court reporter testified that he was called to take the statement by "someone in the sheriff's office" who asked him to hurry because "there's a lawyer on the way." O'Hara arrived just as the defendant was completing his second statement.

The defendant now argues that it was error for the trial court to admit into evidence the statements he made to the officers when they knew he was represented by counsel and counsel was not present, although his presence was known to be forthcoming.

This court was met with a similar situation in *State v. Costa*, 228 Kan. 308, 314, 613 P.2d 1359 (1980). In that case, the

defendant was being held on suspicion of murder. He had retained counsel after his arrest and the police captain knew that he was represented. On the next day following his first meeting with his counsel, the defendant initiated a conversation with the police captain. The defendant was advised of and waived his *Miranda* rights. His counsel was not present at the time. The defendant then gave an incriminating statement.

In addressing the defendant's argument on appeal that the statement should have been suppressed, as it was taken in violation of his right to counsel, this court stated:

"An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he has previously retained counsel does not necessarily make inadmissible a voluntary statement made by the defendant in his counsel's absence. *State v. Johnson*, 223 Kan. 237, 243, 573 P.2d 994 (1977); *State v. Taylor*, 217 Kan. 706, Syl. ¶ 5, 538 P.2d 1375 (1975); see *State v. Jones*, 220 Kan. 136, 138-39, 551 P.2d 801 (1976)." 228 Kan. at 314.

In this case, the defendant does not challenge the voluntariness of his confession (except as to the effect of his mental status), he only challenges the alleged denial of his right to counsel. The trial court conducted a *Jackson v. Denno* hearing and found the defendant had waived his right to have counsel present. We must uphold this finding if it is supported by substantial competent evidence. *State v. Porter*, 223 Kan. 114, 118, 574 P.2d 187 (1977).

The record reveals that the defendant was advised of his *Miranda* rights—including his right to counsel—and waived these rights each time before giving a statement to the law enforcement officers on December 23. Prior to making these statements, he had twice conferred with an attorney—Charles Green. He had also been informed that another attorney had been retained and was planning to meet with him that afternoon. Prior to making his second statement, the defendant told the court reporter, "I know what I'm doing."

Based on these factors, we hold there is substantial competent evidence to support the trial court's finding that the defendant effectively waived his right to counsel. The defendant's statements to the police on December 23 were properly admitted into evidence.

The defendant's final argument for suppression of his confession is that, due to the unethical conduct of the prosecutor,

defendant's statements on December 23 should have been suppressed.

The defendant's argument is that the county attorney, by giving permission for Eddie Dean to talk to the defendant, out of the presence of defendant's counsel, caused another to communicate on the subject of the representation with a party he knows to be represented by a lawyer without prior consent of the other lawyer in violation of DR 7-104(A)(1). 235 Kan. cxlviii. This canon of ethical conduct has been held to be applicable to prosecutors as well as other lawyers. *State v. Morgan,* 231 Kan. 472, 646 P.2d 1064 (1982).

This argument fails for two reasons. First, the county attorney did not violate DR 7-104(A)(1) by allowing Eddie Dean to talk with the defendant because Dean was not an agent of the state, and, as such, the prosecutor was not *causing* another to communicate with the defendant *on the subject of the representation.*

Second, even if Dean had been an agent of the state, this court has previously held, in *State v. Morgan,* 231 Kan. at 479, that the provisions of the Code of Professional Responsibility are unrelated to the admission of evidence. In that case, the defendant—outside the presence of his counsel—made incriminating statements to the prosecutor after waiving his *Miranda* rights. The court held that although the prosecutor had clearly violated DR 7-104(A)(1), the trial court did not err by admitting the defendant's statement. See also Annot., 26 A.L.R. 4th. 102, 134-38. We reiterate our statement in *Morgan*: "Sanctions for violation of DR 7-104(A)(1) are irrelevant to this case." 231 Kan. at 479. Accordingly we affirm the trial court's admission into evidence of all of the defendant's statements on December 23.

The defendant next contends that he was denied a fair trial because of prejudicial remarks by the prosecutor during closing arguments.

The first remark which the defendant claims was prejudicial was as follows:

"This man, the man who wants you to believe his story, is the same man who told Jerry Hill that he doesn't do women and he doesn't do children, with regard to assaults and eliminating people. Well, that's great if you are a woman or child, I guess. But if you are a man in the community, that's bad news."

The defense counsel objected and requested a mistrial. The trial court denied the mistrial, but admonished the jury to disre-

gard "any comments with respect to the effects upon the community."

The next objectionable statement came at the conclusion of the State's closing:

"Ladies and Gentlemen, I think that a key phrase in this case has been the defendant's own statement, 'Let there be peace in your village.' And there has been much made of that, and there have been statements that, perhaps, this was an expression of his relief, that, having extinguished this person, was causing personal conflict within himself. I would urge you, Ladies and Gentlemen, based on the evidence in this case, to go into the jury room and return a verdict of guilty of first degree murder. *So that there can be peace in this village.*" (Emphasis added.)

Defense counsel again entered an objection and moved for a mistrial. The trial court denied the motion, but again admonished the jury "not to consider this case and the evidence in this case with regard to effect upon the community."

On appeal, defendant argues that by invoking the fear of the jurors as to the effect a "not guilty" verdict would have, the prosecutor's statements clearly prejudiced his right to a fair trial. He contends the prejudice was so great that the court's admonishments to the jury could not cure the harm done.

We disagree. The trial court promptly recognized the objectionable aspects of the prosecutor's statements. This prompt action by the trial court cured any possible prejudice to the defendant. In this connection we stated in *State v. Warbritton*, 215 Kan. 534, Syl. ¶ 1, 527 P.2d 1050 (1974), and reiterated in *State v. Perales*, 220 Kan. 777, 780, 556 P.2d 172 (1976), the following:

"Improper remarks made by the prosecuting attorney in his summation to the jury will not provide a basis for reversal where the jury has been instructed to disregard the same, unless the remarks were so prejudicial as to be incurable."

See also *State v. Johnson*, 229 Kan. 42, 45-46, 621 P.2d 992 (1981); *State v. Mick*, 229 Kan. 157, Syl. ¶ 3, 621 P.2d 1006 (1981).

Moreover, due to the overwhelming evidence against the defendant in this case, there is little likelihood the absence of the errors would have changed the outcome of the case, and, as such, the errors were harmless. *State v. Folkerts*, 229 Kan. 608, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981).

Finally, the defendant contends the trial court erroneously failed to grant a mistrial based on the prosecutor's comments on the defendant's right to not testify.

The defendant's defense against the murder charge was that he was insane at the time of the killing. In seeking to establish his insanity, the defendant called several witnesses who testified about various bizarre statements the defendant had made to them prior to the shooting. As the defendant had not taken the stand, the prosecutor objected to these statements on the ground that it was hearsay unless the defendant waived his Fifth Amendment right and took the stand. The prosecutor made this objection three different times. Each time the trial court properly overruled the objection. The testimony was not hearsay because it was not offered for the truth of the defendant's statements, but to show his mental state at the time he made the statements. See K.S.A. 60-460; *State v. Phipps*, 224 Kan. 158, 578 P.2d 709 (1978).

After the second objection by the prosecutor, the defense counsel moved for a mistrial which was denied by the trial court. Following this—when the prosecutor objected for the third time on the offering of such testimony—he stated only that he was objecting for the same reason he had objected earlier; he did not reiterate the fact that the defendant had not taken the stand.

Later in the defendant's presentation of evidence, the defendant did take the stand, thereby waiving his Fifth Amendment privilege against self-incrimination.

We note that the defendant, in arguing he was prejudiced by the prosecutor's comments, cites no authority in support of his position.

We recognize that comments by the prosecutor upon defendant's failure to testify violate the defendant's constitutional right against self-incrimination. *Griffin v. California*, 380 U.S. 609, 14 L.Ed. 2d 106, 85 S.Ct. 1229 (1965); *State v. Reeves*, 224 Kan. 90, 93, 577 P.2d 1175 (1978); K.S.A. 60-439. Comment is not, however, per se a violation requiring reversal. If we find comment is harmless by taking into consideration the nature and extent of the comment in comparison with the strength of the evidence of defendant's guilt, then reversal will not be required. *State v. Henderson*, 226 Kan. 726, 736, 603 P.2d 613 (1979). See Annot., 24 A.L.R. 3d 1093. Here, the defendant, by taking the stand, effectively removed any possible prejudice from the minds of the jurors. The error, if any, is held to be harmless.

Accordingly, we find the trial court did not err by refusing to grant a mistrial based on the prosecutor's comments.

The judgment of the trial court is affirmed.

HOLMES, J., dissenting.