UNITED STATES of America, Plaintiff,

v.

Jose Orlando LOPEZ, et al., Defendants.

No. CR–89–0687–MHP.

United States District Court, N.D. California.

May 24, 1991.

---

John Lyons, Asst. U.S. Atty., Crim. Div., John T. Philipsborn, San Francisco, Cal., for National Ass'n of Crim. Laywers, amicus curiae.

James A. Twitty, Malibu, Cal., for Antonio Hernandez Escobedo.

William L. Osterhoudt, San Francisco, Cal., for defendants.

1. The American Bar Association's most recent *Survey On Lawyer Discipline Systems* indicates that there has been a steady rise in the number of complaints filed against attorneys for ethical violations. In 1986, the average number of complaints per lawyer disciplinary agency was 1,213; by 1988 that number had risen forty one percent, to 1,705. *Survey On Lawyer Discipline Systems—1988 Data,* Center for Professional Responsibility, American Bar Association, page unnumbered. The average number of complaints per agency resulting in a finding of probable cause rose from 132 in 1986 to 222 in 1988, a sixty eight percent increase. *Id.*

The level of funding allotted by bar associations to address lawyer discipline is one measure of increased efforts by those agencies to respond to the public's growing concern regarding attorney misconduct. In 1986 the average lawyer discipline budget per agency was $1,014,-339; this figure had increased sixty percent to $1,618,893 by 1988. *Id.*

Data released by the State Bar of California tells a similar story. Complaint allegations against attorneys in California increased from 12,553 in 1988 to 15,353 in 1989. *Lawyer Discipline In California: A Progress Report for 1988 and 1989,* at 23. The California State Bar's Office of Investigations received a total of 6,512 complaints in 1990, up from 5,961 in 1989.

OPINION

PATEL, District Judge.

INTRODUCTION

The past decade has witnessed a rapidly growing concern regarding the ethical conduct of lawyers. More and more citizens are lodging complaints alleging misconduct by attorneys, and state bar associations are becoming increasingly active in investigating and addressing such complaints.[1] Even with these efforts, the public remains critical of existing mechanisms for lawyer discipline and has demanded more accountability from the legal profession.[2]

Rather than evading the new focus on lawyer misconduct, government attorneys and prosecutors often have found themselves at the center of it.[3] The most recent report of the Attorney General's Office of Professional Responsibility indicates that there has been a notable increase in the number of complaints, both substantiated and unsubstantiated, of ethical violations by federal prosecutors.[4] This growth undoubtedly arises from both the swift increase in the number of attorneys employed by the Department of Justice[5] and

*Eighth Progress Report of the State Bar Discipline Monitor,* March 1, 1991, at 48 (total allegations exceed the number of complaints because some complaints contain more than one allegation against an attorney). 707 attorney discipline cases were filed in California's State Bar Court in 1989, up from 527 in 1987 and 622 in 1988. *Lawyer Discipline In California,* at 23.

2. *See Report to the House of Delegates,* American Bar Association Commission on Evaluation of Disciplinary Enforcement, May 1991, at iii.

3. *See, e.g., House Committee on Government Operations, Federal Prosecutorial Authority In A Changing Legal Environment: More Attention Required,* H.R.Rep. No. 986, 101st Cong., 2d Sess. (1990); Norton, *Government Attorneys' Ethics in Transition,* 72 Judicature 299 (Feb.–Mar.1989).

4. *Annual Report to the Attorney General,* Office of Professional Responsibility, at 5 (1988).

5. Congress has increased funding for the Department of Justice and authorized the hiring of additional prosecutors. As of May 1990, there were approximately seven thousand attorneys employed by the Department. H.R.Rep. No. 986 at 1.

evolving efforts by the Department to limit the rights of suspects and defendants in certain areas.[6] Many commentators have voiced concern over the increasing frequency of incidents of prosecutorial misconduct and the ineffectiveness or non-existence of sanctions designed to prevent such misdeeds.[7]

In the midst of these developments, the Attorney General has issued a policy directive which purports to exempt Department of Justice attorneys from one of the most widely-accepted and time-honored ethical rules governing the conduct of attorneys involved in litigation. The implementation of the Attorney General's policy in this case has resulted in the motion to dismiss now before the court.

BACKGROUND

Defendant Jose Orlando Lopez and co-defendants Antonio Hernandez Escobedo and Alfredo Tarango Olivas were indicted on December 15, 1989. Lopez, Escobedo and Olivas were charged with violations of 21 U.S.C. § 841(a)(1) (distribution of cocaine and heroin); 21 U.S.C. § 846 (conspiracy to distribute cocaine and heroin); and 18 U.S.C. § 2 (aiding and abetting). The case was assigned to Judge Fern M. Smith, who denied bail to defendants Lopez and Escobedo on January 8, 1990.[8]

Shortly after the arrest of the three men, Escobedo's brother contacted attorney James Twitty concerning possible legal representation. Reporter's Transcript ("RT") 3/4/91, at 5. Twitty made several appearances on behalf of the three co-defendants at the outset of the case, primarily at bail and detention proceedings, while he endeavored to locate co-counsel. RT, 2/4/91 at 19; RT, 3/4/91, at 48. There is conflicting evidence in the record as to whether it was initially intended that Twitty would represent Escobedo or Lopez.[9] In any event, Mr. Lopez eventually contacted attorney Barry Tarlow, RT, 2/4/91, at 19–20, who by January 11, 1990 was counsel of record for Lopez.[10] Lopez alleges that Twitty was "not pleased" when he learned that Tarlow would represent Lopez, RT, 2/4/91, at 20, while Twitty contends that he enjoyed a good relationship with Tarlow. RT, 3/4/91, at 9–10.

The record indicates that the posture of the defendants' case and the dynamics of the litigation changed after Tarlow was retained to represent Lopez. At the outset of the case, Twitty discussed possible disposition of the charges against Lopez and Escobedo with Assistant United States Attorney ("AUSA") John Lyons, who was assigned to the case. RT, 3/18/91, at 88. Lyons made it clear to Twitty that he would consider a disposition of the case only if both Escobedo and Lopez agreed to enter into a plea agreement. RT, 3/4/91, at 57–58.

Upon entering the case, attorney Tarlow took the position that Lopez had a viable defense and discussions with the government concerning disposition of the charges against Lopez and Escobedo ceased. RT, 3/18/91 at 88–89. Tarlow avers that Lopez retained his services to "vigorously defend and try the case" and that Lopez had no interest in cooperating with the government. Tarlow Decl. at ¶ 10. Tarlow informed Lopez that it was his general policy

---

*See, e.g.,* Memorandum To All Justice Department Litigators From Dick Thornburgh, Attorney General, June 8, 1989 ("Thornburgh Memorandum"); H.R.Report No. 986; Norton, *Government Attorneys' Ethics In Transition.*

7. Note, *Harmless Error, Prosecutorial Misconduct, and Due Process: There's More to Due Process Than the Bottom Line,* 88 Colum.L.Rev. 1298, 1322 (1988); Steele, *Unethical Prosecutors and Inadequate Discipline,* 38 Sw.L.J. 965, 966 (1984); Allen, *A Serendipitous Trek Through the Advance–Sheet Jungle: Criminal Justice in the Courts of Review,* 70 Iowa L.Rev. 311, 336 (1985); Bilarsis, *Harmless Error: Abettor of Courtroom Misconduct,* 74 J.Crim.L. & Criminology 457, 458 (1983); Freedman, *Discipline An Errant Prosecutor,* N.Y. Times, Jan. 16, 1984, at 15, Col. 2.

8. Olivas did not remain in custody.

9. Lopez testified that Twitty was "mainly" representing Escobedo and was helping the other two defendants obtain counsel. RT, 2/4/91, at 19. Twitty testified that Lopez asked him to be Lopez's lawyer and to assist Escobedo and Olivas in finding counsel. RT, 3/4/91, at 5.

10. Barry Tarlow filed a motion for discovery on Lopez's behalf on January 11, 1990.

not to represent clients in negotiations with the government concerning cooperation and that if Lopez were interested in cooperation, Tarlow would not represent Lopez in any plea negotiations. Tarlow Decl. at ¶ 10.

It also appears that the litigation became more combative after Tarlow arrived on the scene. RT, 3/4/91, at 14–15. Twitty alleges that Lyons did not like Tarlow, RT, 3/4/91, at 14, that the AUSA was "aggravated" by Tarlow's litigation style, RT, 3/4/91, at 53–55, and that there was "no question" that Lyons believed "that the case could be more easily resolved without Tarlow's participation." RT, 3/4/91, at 44. The principal source of conflict between Lyons and Tarlow in the early stages of the case apparently was a dispute concerning what discovery was to be made available to Tarlow. Second Decl. of Lyons at ¶ 33. In spite of this ongoing dispute, Lyons characterizes his relationship with Tarlow as generally "amicable." Second Decl. of Lyons at ¶ 38.

Responsibility for preparation of the defense case was divided among Tarlow, Twitty and Harold Rosenthal, who was retained to represent Olivas. Tarlow authorized both Twitty and Rosenthal to speak with Lopez when necessary in preparation of their cases. Tarlow Decl. at ¶ 18; Twitty Decl. at ¶ 13. Twitty appears to have been given responsibility for a "joint investigation" in the Lopez and Escobedo cases; as a result he generally spoke with both Lopez and Escobedo during his visits to FCI Pleasanton, where the two men were incarcerated awaiting trial. RT, 3/4/91, at 56–57.

Sometime in March or April 1990, Escobedo contacted Twitty by telephone and expressed interest in reopening discussions with the government concerning the possibility of plea agreements. RT, 3/4/91, at 16–17, 65. Lopez and Twitty differ substantially on what transpired following this call.[11]

Lopez contends that Escobedo contacted Twitty to determine if a plea offer made by the government at the outset of the case was still open. RT, 2/4/91, at 48. According to Lopez, Twitty communicated with the government and then apprised Escobedo and Lopez that the government would consider probation in return for cooperation, RT, 2/4/91, at 49–50, but a plea agreement would be possible only if both men were included. RT, 2/4/91, at 50.

Lopez maintains that he was encouraged by Escobedo to participate in new negotiations with the government. At the time, Lopez apparently was distraught over the safety of his children, whom he believed were being abused and in danger because of certain activities of their mother. RT, 2/4/91, at 22–23, 53–54. Lopez agreed to meet with the government to discuss a possible plea agreement in order to obtain early release and to be closer to his children. Id.; RT, 3/4/91, at 17.

Lopez asserts that he discussed with Twitty the possibility of meeting with the government and that Twitty told him it was not necessary for Tarlow, Lopez's attorney, to be present at any such meetings. RT, 2/4/91, at 21. Twitty also allegedly represented to Lopez that Lyons believed it would be easier to reach a plea agreement if Tarlow were not present. RT, 2/4/91, at 56–58. Lopez contends that he agreed to go ahead with the meetings without Tarlow because he believed it would be easier to work out a favorable disposition of the case in Tarlow's absence and because he was concerned about the expenses involved were Tarlow to participate. RT, 2/4/91, at 18–21.

Lopez also maintains that he was told by Twitty and Lyons that meeting with the government without Tarlow's consent or knowledge would not jeopardize his relationship with Tarlow. RT, 2/4/91, at 23–24. In addition, Lopez insists that he did not wish to have another lawyer represent him at the meetings with the government because he feared that as a result he would

---

11. As the following discussion will make clear, it is not necessary for the court to resolve the discrepancies in the testimony of Lopez, Twitty and Lyons in order to rule on Lopez's motion to dismiss.

lose Tarlow as his lawyer. RT, 2/4/91, at 56.

Twitty concedes that, after receiving an initial telephone call from Escobedo regarding a possible plea agreement, he travelled from Los Angeles to Pleasanton to discuss the matter with Escobedo and Lopez without informing Tarlow of the upcoming meeting. RT, 3/4/91, at 17. Twitty further acknowledges that, prior to contacting the government on behalf of Lopez and Escobedo, he spoke with Lopez between five and nine times regarding the possibility of meeting with the government and that he made a second trip to Pleasanton to discuss plea negotiations with the two men; all of these communications were concealed from Lopez's attorney, Tarlow. RT, 3/4/91, at 22–23.

Twitty advised Lopez and Escobedo that if they wanted to be released so as to be closer to their children their only option was to cooperate with the government. RT, 3/4/91, at 18. However, Twitty denies encouraging Lopez or Escobedo to enter into negotiations with the government. Indeed, Twitty contends that he was not interested in negotiating a plea agreement and preferred to try the case. RT, 3/4/91, at 63.

Twitty asserts that he told Lopez and Escobedo to seriously consider whether they wished to proceed with plea negotiations and that he agreed to contact the government on their behalf only after they called him numerous times and threatened to communicate with the government directly. RT, 3/4/91, at 22–23, 92. Twitty claims that he offered Lopez and Escobedo a "second opinion" regarding case strategy RT, 3/4/91, at 90, and maintains that he honored the defendants' request that he secretly contact the government without notifying Tarlow because he considered Lopez and Escobedo to be "friends." *Id.* Twitty purportedly considered himself to be little more than a "mailman" delivering a message to the government. RT, 3/4/91, at 95.

Twitty also denies suggesting to Lopez that Tarlow need not be present at the meeting or that a favorable disposition could be obtained more easily without Tarlow. RT, 3/4/91, at 55. Instead, Twitty avers that he told Lopez to speak with Tarlow about his interest in plea negotiations, but that Lopez refused because he believed that Tarlow would no longer represent him if he chose to cooperate with the government or plead guilty. RT, 3/4/91, at 18–19. Twitty also contends that he suggested to Lopez that he retain another lawyer if Tarlow could not represent Lopez in plea negotiations; Lopez refused, Twitty relates, because the defendant believed Tarlow was a good lawyer and wanted him to try the case if it went to trial. RT, 3/4/91, at 26.[12]

**12.** The court finds that neither Lopez' nor Twitty's testimony concerning the events leading up to Twitty's initiation of contact with the government is completely credible. For example, Lopez testified that he agreed to meet with the government without Tarlow because he was convinced that Tarlow's presence would make resolution of the case more difficult and because he was concerned about the expense involved should Tarlow attend. Lopez denied being told by Tarlow that Tarlow would not represent him in plea negotiations and testified he believed Tarlow would work out an agreement for him with the government if he requested. RT, 2/4/91, at 46–48. This testimony conflicts with the testimony of Twitty on this issue. More importantly, it conflicts with Tarlow's own description of the understanding between Tarlow and Lopez concerning plea agreements. In his sworn declaration, Tarlow stated:

> Under our agreement, if an offer of cooperation was presented by the Assistant United States Attorney, I would convey that offer to Mr. Lopez for his consideration. I would not, however, be personally involved in the continuing negotiations with the government, since this conduct is personally morally and ethically offensive to me. Since Mr. Lopez had retained me to vigorously defend and try the case, another attorney would be willing and better able to arrange his informant activities.

Tarlow Decl. ¶ 10.

Nor does Twitty's testimony ring completely true. Twitty's assertion that he was not interested in negotiating a disposition of the charges against Lopez and Escobedo is not credible in light of the fact that he initiated the contact with the government on behalf of Lopez and Escobedo, concealed his ongoing communications concerning plea negotiations from Tarlow and, as the remaining discussion of the facts will make clear, went to considerable lengths to ensure that the meetings with the government took place. In addition, Twitty conceded that he

The record makes clear that Twitty did indeed contact AUSA Lyons on behalf of Lopez and Escobedo. Once again, the parties differ as to what transpired next. Lyons asserts that when Twitty contacted him, Twitty explained that Lopez did not want Tarlow present at any meetings with the government because "Tarlow didn't represent his best interest in this particular context." RT, 11/19/90, at 52.

Lyons claims he did not ask Twitty to explain further. RT, 11/19/90, at 54. Instead, the prosecutor hypothesized that Lopez feared that if Tarlow learned of the negotiations with the government, Lopez's family would be endangered. This belief was allegedly supported by information possessed by the government which indicated that the families of Lopez and Escobedo had been threatened by a drug source. RT, 11/19/90, at 53; RT, 12/13/90, at 14. Lyons assumed that Lopez was part of a drug ring of some sort and that Tarlow's fees were being paid by this ring. Second Lyons Second Decl. at ¶ 4.

Lyons avers that it was his preference that Tarlow be present at the meetings or that Lopez be represented by some other attorney. Second Lyons Decl. at ¶ 5. Twitty told Lyons that Lopez wanted to speak to the government without a lawyer. *Id.* In addition, Twitty purportedly represented "that Lopez had come to trust him [Twitty], and that, while Lopez understood Twitty could not represent him, Lopez was comfortable meeting with [sic] government if Twitty were there." *Id.*

Twitty's testimony contradicts the representations made by Lyons. Twitty alleges that, upon contacting Lyons, he informed the AUSA that Lopez did not want Tarlow present because Lopez believed Tarlow would no longer represent him if he considered a guilty plea and because Lopez wanted Tarlow to take the case to trial if no plea agreement was reached. RT, 3/4/91, at 26. Twitty denies ever telling

Lyons that Lopez believed Tarlow did not represent his best interests in this matter. RT, 3/18/91, at 61–62. Moreover, Twitty insists that he explicitly told Lyons during their first telephone conversation and on numerous occasions thereafter that, to his knowledge, "nobody that Lopez supposedly worked for or with was paying any of his fees", RT, 3/4/91, at 40, and that Lopez did not believe his safety or that of his family would be jeopardized if Tarlow were to learn of the plea negotiations. *Id.* at 40, 74. Twitty asserts that this was the message "that we communicated strongest and most forthright in everything in terms of these conversations." *Id.* at 39. Twitty also contends that "all the government's claims about dangers to the Lopez family are simply unfounded." *Id.* at 74.

During their initial conversation, Twitty and Lyons discussed the "sensitivity" of Lopez meeting with the government without his attorney's knowledge or consent. RT, 11/19/90, at 52. Lyons informed Twitty that he would seek the intervention of the court. RT, 3/4/91, at 24; Second Lyons Decl. at ¶ 6.

Lyons eventually had an *ex parte* communication with the court; the prosecutor testified that he informed the court that the "common context" in which approaches such as that made by Lopez occur are "situations in which the defense lawyer is somehow connected to somebody else and that the defendant is concerned about word getting back." RT, 11/19/90, at 58. Lyons failed to inform the court of Twitty's explanation as to why Lopez wished to meet with the government without his lawyer. Judge Smith determined that Lopez should be interviewed by another judicial officer. Second Lyons Decl. at ¶ 10.

An *in camera* interview of Lopez by Magistrate Judge Claudia Wilken was held on May 21, 1990. Tarlow was not present for nor informed of the proceeding. Although Lyons testified that he did not inform Magistrate Judge Wilken of his suspi-

---

warned Harold Rosenthal, counsel for co-defendant Olivas, not to inform Tarlow of the meetings because that would "mess up the deal." RT, 3/18/91, at 86–87. These are not the ac-

tions of an attorney who had no interest in negotiating a disposition of the charges with the government.

cion concerning the source of Tarlow's fees, the Magistrate made numerous references to the alleged fee arrangement during the May 21, 1991 *in camera* proceeding. RT, 5/21/90, at 4, 5, 7.[13] The transcript of the May 21 proceeding thus strongly suggests that Magistrate Judge Wilken was operating under the assumption that Tarlow's fees were being paid by a third party.

Lopez told Magistrate Judge Wilken that he wished to ask the government two questions about his case. RT, 5/21/90, at 9–10, 15–17. Magistrate Judge Wilken warned Lopez of the danger of meeting with the government without assistance of counsel. RT, 5/21/90, at 6–7, 9–10. She advised Lopez that he could have Tarlow assist him in the matter, have a public defender appointed, or represent himself. *Id.* at 14. The Magistrate Judge also informed Lopez of his right to counsel and advised him that Twitty was representing his client, Escobedo, and not Lopez. *Id.* at 21.

The Magistrate Judge then read Lopez a written waiver, prepared by the government, which stated that Lopez was represented by Tarlow, that he wished to speak to the government without Tarlow present, that he did not believe Tarlow represented his best interests in the matter, and that he waived his right to have Tarlow's assistance at the meeting. RT, 5/21/90, at 21–24. Lopez signed the waiver, *Id.* at 25, but sought assurances from the court that he was waiving his right to counsel only for his initial plea negotiations with the government. *Id.* at 23.

At the close of the proceeding, AUSA Lyons appeared before the court. Lyons explained that the meeting between the government, Lopez, Escobedo and Twitty would be "off the record." RT, 5/21/90, at 27. The Magistrate Judge informed Lyons that Lopez had waived his attorney's presence for the purpose of asking the government two questions and that she would convene another *in camera* proceeding if

the defendant wished to proceed with discussions with the government after receiving answers to his questions. *Id.* at 25–26, 32.

There is general agreement among the parties as to much of what occurred during the first meeting among the government, Lopez and Escobedo. The meeting, which lasted for approximately one and a half hours, RT, 3/4/91, at 28, took place in Lyons' office and was attended by Lyons, Twitty, Lopez and Escobedo. RT, 2/4/91, at 22, Lyons Decl. at ¶ 2. The meeting apparently began with Lyons administering the Miranda warning to Lopez. RT, 3/4/91, at 29; Second Lyons Decl. at ¶ 13. Lyons explained that the meeting was to be a "free talk" and that the government would not use any of the information from the meeting against Lopez or Escobedo, Second Lyons Decl. at ¶ 12. No record of the meeting was kept. Lyons Decl. at ¶ 2. Lyons alleges he told Lopez that he preferred to have Tarlow or some other lawyer present representing Lopez, but that Lopez indicated he wished to proceed without representation. Second Lyons Decl. at ¶ 13.

Twitty informed Lopez at the outset of the meeting that he could not act as Lopez's lawyer. RT, 2/4/91, at 25; RT, 3/4/91, at 30. Despite this, Twitty apparently advised both Lopez and Escobedo during the meeting. RT, 11/19/90, at 73, 77; Lyons Second Decl. at ¶¶ 13, 17; Gov. Supp. Response at 4.

Lopez was primarily interested in learning whether there was any way he could be released to be closer to his children and, if he were to cooperate with the government, how his safety and that of his family could be guaranteed. RT, 2/4/91, at 22–23; Second Lyons Decl. at ¶ 14. Lopez appeared deeply disturbed by the plight of his children and cried at one point during the meeting. RT, 2/4/91, at 23; RT, 3/18/81, at 31; Second Lyons Decl. at ¶ 15.

---

**13.** The Magistrate Judge made numerous references to the possibility that Tarlow's fees were being paid by a third party, she did not ask Lopez if the fees were being paid by somebody with a conflicting interest or if Lopez feared for his safety should Tarlow learn of the pending plea negotiations.

At some point, Lyons asked if Tarlow's fees were being paid by the source of the drugs in the transaction; Twitty explained that the fees were not being paid by any third party but instead by Lopez and his family. RT, 3/18/91, at 75–76; Second Lyons Decl. at ¶ 19. Twitty again informed Lyons that Lopez did not want Tarlow present at the meeting because Tarlow's representation was conditioned on Lopez not entering a plea and because Lopez feared he would lose Tarlow's services if Tarlow were to learn of the plea negotiations. Second Lyons Decl. at ¶ 19. Lopez concurred in Twitty's explanation. *Id.*

Lopez alleges that during the first meeting Lyons told him "it's better if you get rid of Tarlow so we can work out a deal and get this thing over." RT, 2/4/91, at 57, 62–63. According to Twitty, Lyons advised Lopez that if Tarlow had conditioned his representation on Lopez not pleading guilty, Lopez would have to fire Tarlow and retain new counsel in the event he chose to cooperate. RT, 3/18/91, at 72–73.

Lopez provided no concrete information to the government during the meeting, although he did indicate that he might be willing to provide names and other information that would assist the prosecution. RT, 2/4/91, at 58–59; RT, 3/4/91, at 31–32.

Following the first meeting, Twitty spoke with Lopez and Escobedo once or twice by telephone and traveled to Pleasanton to meet with the two men to further discuss the possibility of a plea agreement, RT, 3/4/91, at 34; once again, these contacts were concealed from Tarlow. Lopez contends that Twitty encouraged him to participate in a second meeting with the government and to provide information concerning the drug source, RT, 2/4/91, at 61; Twitty claims that it was Lopez who requested that the second meeting be scheduled. RT, 3/4/91, at 35. In any event, Twitty called Lyons and over the course of two or three telephone conversations arranged for a second meeting with the government. RT, 3/4/91, at 35. During one of these conversations, Twitty again stressed to Lyons that Tarlow's fees were not being paid by a third party and that Lopez's desire to proceed without Tarlow was not based on fear for his safety or that of his family. Second Lyons Decl. at ¶ 20.

On May 30, 1991, Lopez was once again taken before Magistrate Judge Wilken, who verified that Lopez wished to meet with the government a second time without Tarlow present. RT, 5/30/91, at 3. Like the first meeting, the second was held in Lyons' office and was attended by Lyons, Lopez, Escobedo, and Twitty.[14] At the second meeting, Lyons pressured Lopez and Escobedo to provide some significant information concerning the drug source as a sign of good faith, RT, 11/19/90, at 78–79; RT, 2/4/91, at 27; RT, 3/4/91, at 40–41; RT, 3/18/91, at 69–71. Although hesitant to cooperate, RT, 3/4/91, at 100, Lopez eventually gave Lyons several names of individuals who allegedly were involved in drug trafficking. RT, 3/4/91, at 42; RT, 2/4/91, at 29–30.[15]

Lopez maintains he was pressured by both Twitty and Escobedo to provide information to Lyons. RT, 2/4/91, at 28–29. Twitty denies urging Lopez to furnish information to the government, RT, 3/4/91, at 102, and claims to have advised his client, Escobedo, to "do what you want to." *Id.,* at 101.[16] Lopez also alleges that after he mentioned one of the names to Lyons, Twitty interjected that that information would implicate Lopez's entrapment defense. RT, 2/4/91, at 31–32. Twitty denies making any reference to defense strat-

---

**14.** DEA agent James Bannister was apparently present in Lyons' office for a brief period prior to the arrival of Twitty. Nothing of substance occurred while Bannister was present and the agent left when Twitty arrived. RT, 2/4/91 at 26.

**15.** There is disagreement among the parties as to the names provided to Lyons by Lopez. Lopez testified that he gave Lyons the names of three individuals. RT, 2/4/91, at 30. Twitty recalls that Lopez provided the names of two individuals. RT, 3/4/91, at 42. Lyons alleges that Lopez provided two names, the real name and alias of a single individual. RT, 11/19/90, at 79. The court need not resolve this discrepancy.

**16.** Escobedo did not testify at the evidentiary hearings or provide a declaration to the court.

egies during the meeting. RT, 3/4/91, at 101.

Following the second meeting, Lyons sent Twitty a proposed plea agreement for Escobedo and indicated that, while the same type of deal might be available for Lopez, Lopez would have to obtain a lawyer. RT, 11/19/90, at 82. Twitty provided Lopez with a copy of the proposed plea agreement. RT, 2/4/91, at 78. Lopez claims to have been told by Twitty that Twitty could act as his lawyer in finalizing the plea agreement. *Id.* at 79–80. Twitty discussed the plea agreement with Lopez and Escobedo; he eventually contacted Lyons and told the prosecutor that he was trying to determine a means of avoiding a mandatory minimum sentence for Lopez and Escobedo. RT, 11/19/90, at 83. The record indicates that, at some point, Lopez and Escobedo rejected the plea agreement proposed by the government. RT, 2/4/91, at 78.

In early August 1990, Lyons had a telephone conversation with Harold Rosenthal, attorney for co-defendant Alfredo Olivas; during this call the prosecutor alerted Rosenthal to the fact that the government had been negotiating a potential plea agreement with Lopez and Escobedo without Tarlow's presence, consent, or knowledge. Second Lyons Decl. at ¶ 26. Rosenthal contacted Twitty, who warned Rosenthal not to inform Tarlow of the meetings because it would "mess up the deal." RT, 3/18/91, at 86–87. Despite Twitty's admonition, Rosenthal notified Tarlow. *Id.* at 87. Tarlow quickly filed papers with the court indicating that he had learned of the secret meetings between his client and the government.

On August 15, 1990, Tarlow appeared before the court and withdrew as counsel of record for Lopez because of the conflict that had been created by the secret meetings. At the August 15 hearing, the government informed the court that there was no evidence of impropriety on Tarlow's part.

Defendant Lopez has now filed his motion to dismiss the indictment, alleging that the government violated both his sixth amendment right to counsel and rules of professional conduct, which prohibit an attorney from communicating with an opposing party who is represented without the knowledge and consent of opposing counsel. The court held a series of evidentiary hearings on the motion and took testimony from AUSA Lyons, attorney Twitty, and defendant Lopez.[17]

## DISCUSSION

The proceedings in connection with defendant Lopez's motion to dismiss focused primarily on the applicability to this case of ethical rules limiting contact between an attorney and a represented party, and it is to this issue that the court initially turns.

### I. *Ethical Requirements*

Rule 2–100 of the Rules of Professional Conduct of the State Bar of California states as follows:

(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer ...

(C) This rule shall not prohibit:

(1) Communications with a public officer, board, committee, or body;

(2) Communications initiated by a party seeking advice or representation from an independent lawyer of the party's choice; or

(3) Communications authorized by law.

Rule 2–100 tracks the language of American Bar Association Disciplinary Rule ("DR") 7–104(A)(1) and ABA Model Rule of Professional Conduct 4.2.[18] This court,

---

**17.** Judge Smith referred the motion to dismiss to this court and has since recused herself from the case.

**18.** ABA DR 7–104(A)(1) states:

During the course of his representation of a client a lawyer shall not: (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so....

through its Local Rules, has adopted the State Bar's Rules of Professional Conduct as the applicable standards of professional conduct for the Northern District of California.[19]

In the case at bar, the prosecutor essentially takes the position that he is exempt from Rule 2–100, and therefore, from the rules explicitly adopted by this court to govern the conduct of attorneys who appear before it. In asserting this position, the prosecutor relies primarily on a policy directive issued by Attorney General Richard Thornburgh on June 8, 1989.[20] The Thornburgh Memorandum declares that Department of Justice ("DOJ") attorneys engaged in law enforcement activity are not bound by the strictures of DR 7–104.

While the prosecutor relies primarily on the Thornburgh Memorandum to support his position with regard to the alleged violation of this court's Local Rules, he also advances several other arguments. First, the government posits that the separation of powers doctrine prevents this court from enforcing its Local Rules against DOJ attorneys where, as here, there is a conflict between those Rules and the policies of the Department of Justice. Second, the prosecutor contends that Rule 2–100 exempts all criminal investigations from coverage. Third, it is argued that the secret meetings between the government and defendant Lopez are akin to pre-indictment contacts and therefore should be considered exempt from Rule 2–100.

Finally, the government suggests that several factors particular to this case counsel against a finding of prosecutorial misconduct. These include the facts that the Magistrate intervened prior to the secret meetings and that defendant Lopez initiated the contact with the government and waived his right to counsel.

As the court will explain below, the government's contentions are completely devoid of merit.

## A. Thornburgh Memorandum

 The Thornburgh Memorandum laments the purported use of DR 7–104 by defense counsel "to prohibit communications by law enforcement personnel with the target of a criminal investigation, whether or not a constitutional right to counsel has attached." Memo at 1. The Memorandum identifies two contexts in which the "problem" has most often arisen: (1) where government agents or attorneys seek to covertly or overtly interview a suspect who has retained counsel; and (2) in instances of multiple representation, where the principal target of an investigation pays an attorney to represent several individuals, or where an organization under investigation pays an attorney who claims to represent all employees of the organization. Memo at 2.

The Thornburgh Memorandum reflects the Attorney General's perception that enforcement of DR 7–104 represents "a substantial burden on the law enforcement process." Memo at 2. As a result, the Memorandum seeks to exempt DOJ attorneys from compliance with the ethical duties created by the rule. Much of the language of the Memorandum suggests that the Attorney General's policy applies primarily in the pre-indictment context.[21]

---

Model Rule 4.2 states:
 In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
Because of the shared language and purpose of ABA DR 7–104, ABA Model Rule 4.2, and Rule 2–100 of the State Bar of California, the court will utilize authority and sources concerning all three in this opinion.

**19.** U.S. District Court, Northern District of California, Local Rule 110–3.

**20.** The record makes it clear that AUSA Lyons was relying on the Thornburgh memorandum when he decided to meet with defendant Lopez on two different occasions and to conceal these meetings from Lopez's attorney. RT, 11/19/90, at 44.

**21.** For example, the Memorandum states that "[i]t is the clear policy of the Department that in the course of a criminal investigation, an attorney for the government is authorized to direct and supervise the use of undercover law enforcement agents, informants, and other cooperating individuals to gather evidence by communicating with any person *who has not been*

Moreover, the examples provided by the Memorandum suggest that the policy was meant to be applied in organized crime cases and corporate or organizational-type settings. Memo at 6.

While the Memorandum thus seems to suggest that the parameters of the Attorney General's policy are limited, it nonetheless closes with the sweeping statement that "the 'authorized by law' exemption in DR 7–104 applies to *all* communications with represented individuals by Department attorneys or by others acting at their direction." Memo at 7 (emphasis added). If there were any doubts as to the scope of the policy, they have been dispelled by the brief filed by the Department of Justice in this case, which makes clear the Department's position that the purported exemption exists after indictment and outside the corporate and organized crime contexts. DOJ Brief at 4–7.

There are profound flaws in the Attorney General's policy and they are demonstrated within the four corners of the Thornburgh Memorandum. Even a cursory examination of the authority cited by the Attorney General reveals that the cases do not support the policy articulated in the Memorandum.

For example, the Attorney General cites *Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), for the proposition that "when an individual believes that his lawyer is representing not his own interests but the interests of a third party, and that announcing to his lawyer that he has made contact with Government investigators could have dire consequences," direct communication with the government may benefit the client and vindicate his rights. Memo at 2. *Wood* nowhere makes such a radical statement.

The *Wood* Court found that employees of an adult theater who were represented by an attorney paid by their employer might have been prejudiced by the potential con-

flict of interest between the employer and the employees. *Wood,* 450 U.S. at 266–67, 101 S.Ct. at 1100–01. The Court noted the dangers of a criminal defendant's lawyer being paid by a third party and remanded the defendants' case for a hearing to determine whether the conflict of interest had resulted in a due process violation. *Id.* at 271–72, 101 S.Ct. at 1103–04. However, the Court's opinion makes it clear that the solution to any conflict of interest between defendants and their attorney would be appointment of new counsel, not direct communication between the defendants and the government. *Id.*

Other examples of the Attorney General's strained use of existing case law are found in the Memorandum's reliance on *Kolibash v. Comm. on Legal Ethics of W. Virginia Bar,* 872 F.2d 571 (4th Cir.1989) and *Sperry v. Florida,* 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963). In *Kolibash,* the Fourth Circuit ruled that disciplinary proceedings involving a federal officer could be removed to federal court. 872 F.2d at 575. Nowhere does *Kolibash* suggest that federal officers are not subject to governing ethical rules. It is even harder to discern the relevance of *Sperry v. Florida,* where the Supreme Court ruled that a state does not have the power to prohibit patent agents authorized by the U.S. Patent Office from operating within its boundaries. 373 U.S. at 401–402, 83 S.Ct. at 1334–35. The court is hard pressed to see what guidance *Sperry* offers on the issue of whether ethical rules apply to DOJ attorneys.

Finally, the Attorney General's Memorandum cites to numerous cases which purportedly recognize the legitimacy of undercover law enforcement investigations, even when the investigations involve individuals who keep an attorney on retainer. Memo at 2. Without exception, however, these cases involve pre-indictment investigations.[22] Several of the decisions cited by

---

*made the subject of formal federal criminal adversarial proceedings arising from that investigation,* regardless of whether the person is known to be represented by counsel. Memo at 5–6 (emphasis added).

22. *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981) ("We again emphasize the factual setting of the tape recording: a non-custodial environment, prior to Kenny's

the Department of Justice go to great lengths to distinguish the interests at stake in the pre-indictment context from those which must be considered once an individual has been indicted and is in custody.[23]

Indeed, those courts asked to decide whether DR 7–104 applies in the pre-indictment context have assumed, without finding it necessary to discuss, that the Rule applies to government attorneys in the post-indictment context. *See, e.g., United States v. Hammad,* 858 F.2d 834, 837–38 (2d Cir.1988), *cert. denied,* —— U.S. ——, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990) (DR 7–104 applies in criminal prosecutions in criminal cases; closer question whether Rule applies pre-indictment); *United States v. Lemonakis,* 485 F.2d 941, 955 (2d Cir.1973) (court assumes it would be improper for a prosecutor to interview a criminal defendant under indictment in the absence of his retained counsel).

This court has attempted without success to locate *any* authority for the proposition that DR 7–104 does not apply to a government attorney who communicates with a represented individual under indictment. This, of course, is not surprising in light of the tortured logic of the Attorney General's policy.

The Department asserts that government attorneys involved in criminal investigations are "authorized by law" to make contact with represented individuals by virtue of federal statutes which empower the Attorney General to investigate and prosecute criminal violations. Memo at 5, 7; Gov.Supp. Response at 6. The implications of this assertion are alarming, since nearly all conceivable action taken by a prosecutor involve these activities. Indeed, the entire post-indictment conduct of a prosecutor is driven by the goal of completing the prosecution.

The government argues that federal statutes 28 U.S.C. §§ 509, 515(a), 516, 533 and 547 authorize Department attorneys to make contact with represented individuals in criminal investigations. Gov.Supp. Response at 6. However, these are nothing more than general authorizing statutes; none expressly or impliedly authorize government attorneys either to disregard court-adopted rules or to violate ethical rules regarding contact with represented individuals. For example, section 547 defines the duties of a U.S. Attorney.[24]

charge, arrest, or indictment. In our view, the Government's use of such investigative techniques at this stage of a criminal matter does not implicate the sorts of ethical problems addressed by the Code."); *United States v. Lemonakis,* 485 F.2d 941, 956 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974) (pre-indictment government recording of meeting between informant and represented individual without attorney present does not violate DR 7–104); *United States v. Sutton,* 801 F.2d 1346, 1366 (D.C.Cir.1986) (pre-indictment taping of represented individual absent counsel does not violate DR 7–104); *United States v. Fitterer,* 710 F.2d 1328, 1333 (8th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983) (DR 7–104 does not apply when represented individual are not indicted or charged and are not in custody); *United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1983) (no violation of DR 7–104 where government informant taped conversation with represented individual in absence of counsel prior to indictment); *United States v. Jamil,* 707 F.2d 638, 646 (2d Cir.1984), (in post-indictment context, where government investigators were not acting as alter egos of prosecutor and prosecutor only became aware of recording after it was made, customs agents' action in wiring informant and

recording conversation with represented suspect did not violate DR 7–104).

**23.** *See, e.g., Lemonakis,* 485 F.2d at 956; *Kenny,* 645 F.2d at 1339.

**24.** Section 547 states as follows:
Except as otherwise provided by law, each United States attorney, within his district, shall—
(1) prosecute for all offenses against the United States;
(2) prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned;
(3) appear in behalf of the defendants in all civil actions, suits or proceedings pending in his district against collectors, or other officers of the revenue or customs for any act done by them or for the recovery of any money exacted by or paid to these officers, and by them paid into the Treasury;
(4) institute and prosecute proceedings for the collection of fines, penalties, and forfeitures incurred for violation of any revenue law, unless satisfied on investigation that justice does not require the proceedings; and
(5) make such reports as the Attorney General may direct.

Courts interpreting section 547 have consistently ruled that this statute does not exempt U.S. Attorneys from their obligations to act fairly and with proper deference to the rights of the accused. *United States v. Bess*, 593 F.2d 749, 754 (6th Cir. 1979); *Dugan Drug Stores, Inc. v. United States*, 326 F.2d 835, 837 (5th Cir.1964); *Dunn v. United States*, 307 F.2d 883, 885 (11th Cir.1962).

The ABA Committee on Professional Ethics has found only limited circumstances where the "authorized by law" exception to DR 7–104 applies, such as where "applicable statutes or procedural rules or rules of law in a particular jurisdiction *expressly permit* an offer of judgment to be served directly upon an adverse party...." ABA Comm. on Prof. Ethics & Grievances Informal Op. 985 (1967). There is no federal statute which authorizes government attorneys to question represented parties in the absence of counsel [25] and the rule of law in this jurisdiction, as embodied in this court's Local Rules, explicitly prohibits such contact.

Were this court to accept the Department's argument in this regard, it is not clear that there would be *any* conduct the prosecutor could not undertake, as long as it was pursuant to his or her responsibility to investigate and prosecute crimes. DOJ attorneys would be exempt from rules adopted by federal courts to govern ethical conduct of attorneys practicing before them. This is, quite simply, an unacceptable result. Local rules are clearly meant to apply to *all* attorneys practicing in federal court, regardless of the client they represent.

Without an ethical restraint, a prosecutor's authority to communicate with represented individuals would be virtually limitless.[26] The courts have been careful to avoid such a result and have thus held that Department attorneys are authorized to communicate with represented individuals without their attorney only in the pre-indictment context, *United States v. Hammad*, 858 F.2d at 839–40 (use of informants by prosecutor in pre-indictment, non-custodial situation generally falls within "authorized by law" exception to Rule); *United States v. Chestman*, 704 F.Supp. 451, 454 (S.D.N.Y.1989), *rev'd on other grounds*, 903 F.2d 75 (2d Cir.1990), *reconsideration granted, en banc*, Fed.Secur.L.Rep. (CCH) ¶ 95439 (government recording of conversations between informant and represented individual are "authorized by law" in the pre-indictment, non-custodial context), and where specific procedural rules authorize the government conduct. *See, e.g., United States v. Schwimmer*, 882 F.2d 22, 28 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990) (questioning of represented individual before a grand jury in the absence of counsel falls within the "authorized by law" exception of Rule DR 7–104 in light of Fed.R.Crim.P. 6(d), which prohibits the presence of defense counsel in the grand jury room).

The Attorney General's "authorized by law" theory thus has no foundation. Indeed, there are compelling reasons why the ethical prohibition encompassed in Rule 2–100 and analogous ABA rules should apply to DOJ attorneys, at least in the post-indictment context.

 The ethical norm that an attorney should not communicate with a represented individual in the absence of that individual's attorney is longstanding and was codified as Canon 9 of the ABA Canon of Professional Ethics in 1908.[27] DR 7–104 is widely accepted and the rule or its equiva-

---

**25.** Memorandum to the Hse. Comm. on Gov. Operations, Cong. Research Service, "Alleged Act of Prosecutorial Misconduct: Communications With Persons Represented By Counsel Without Consent Of Counsel Or The Authority Of Law," Nov. 16, 1989, at CRS–2.

The Department of Justice itself has previously conceded that there is no statutory authority for government contacts with represented individuals. Memo Opinion for the Deputy Attorney General, 48 Off.Op. of Legal Counsel 576, 581 (April 18, 1980).

**26.** Green, *A Prosecutor's Communications With Defendants: What Are The Limits*, 24 Crim.L. Bull. 283, 290 (1988).

**27.** *Id.* at 284.

lent is now in effect in every state.[28] The rule is designed both to protect the represented individual from overreaching opposing counsel and to ensure that the adverse party's attorney can function properly. State Bar of California, Formal Opinion No. 1979–49, at IIA–128 (1979); *People v. Green*, 405 Mich. 273, 274 N.W.2d 448, 453 (1979). The prohibition against communication with a represented party thus recognizes the inherent danger in a layperson conducting negotiations with an opposing lawyer and the likelihood that such negotiations would destroy the confidence essential to the attorney-client relationship and hamper the subsequent performance of the represented party's counsel. *United States v. Batchelor*, 484 F.Supp. 812, 813 (E.D.Pa.1980).

Courts have consistently ruled that DR 7–104 applies to prosecutors.[29] *See, e.g., United States v. Hammad*, 858 F.2d at 837–38; *United States v. Thomas*, 474 F.2d 110, 111 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *United States v. Lemonakis*, 485 F.2d at 955; *United States v. Guerrerio*, 675 F.Supp. 1430, 1438 (S.D.N.Y.1987). Indeed, it can be argued that the prohibition against communication with a represented individual is even more important in the criminal context than in civil cases. A prosecutor "has more direct power over the lives, property and reputations of those in [his] jurisdiction than anyone else in this nation...."[30] In light of the prosecutor's tremendous power and the fundamental individual rights at stake in criminal prosecutions, " 'the character, quality, and efficiency of the whole [criminal justice] system is shaped in great measure by the manner in which the prosecutor exercises his or her broad discretionary powers.' "[31]

It is for this very reason that ABA Prosecution Function Standard 3–1.1(d) makes it the duty of every prosecutor "to know and be guided by the standards of professional conduct as defined in the codes and canons of the legal profession...."[32] This duty has been codified in the Department of Justice Standards of Conduct, which require DOJ attorneys to be guided in their conduct by the Code of Professional Responsibility of the ABA. 28 CFR § 45.735–1.

In light of the prominent and unique role of the Department of Justice in this country's litigation, the suggestion that DOJ attorneys should be exempted from a longstanding and universally applied ethical norm is alarming. Former Chief Justice Burger aptly characterized the Department of Justice as "the world's largest law firm" and noted that "its various Divisions work together toward the ultimate objective for which they were created—to promote the interests of the sovereign and of the public." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 471, 103 S.Ct. 3133, 3162, 77 L.Ed.2d 743 (1983) (Burger, C.J., dissenting). By May 1990 there were approximately seven thousand attorneys employed by the Department.[33] As Attorney General Thornburgh has recognized, "[t]here is no organization whose legal work is of more importance to the coun-

---

**28.** *Id.*

**29.** While there is near unanimity among the courts that DR 7–104 and its equivalent counterparts apply to prosecutors, several commentators have argued that the ethical prohibition should not apply to criminal investigations. *See* Note, *Prosecutorial Investigations And DR 7–104(A)(1)*, 89 Colum.L.Rev. 940 (1989); *A Prosecutor's Communications*, 24 Crim.L.Bull. 283. Even these commentators, however, generally recognize the value of the rule when plea bargaining is at issue, as in the case at bar. 24 Crim.L.Bull. at 320.

**30.** Corrigan, *On Prosecutorial Ethics*, 13 Hastings Const. Law Quarterly 537, 540 (1986).

**31.** H.R.Rep. No. 986 at 3 (quoting Prepared Statement of William W. Taylor III, on behalf of the American Bar Association).

**32.** American Bar Association, Standards For Criminal Justice, Prosecution Function Standard 3–1.1.

**33.** H.R. Report No. 986 at 1.

try." [34] As "the nation's litigator," [35] the Department and its attorneys must be held accountable to the same court-adopted ethical rules that govern all other lawyers.

Given the above discussion, the court finds that DR 7–104 and its equivalent, Rule 2–100 of the State Bar of California, apply to DOJ attorneys, at least in the post-indictment phase of criminal investigations and prosecutions. To the extent that the Thornburgh Memorandum instructs federal prosecutors to the contrary, it is misguided and not premised on sound legal authority. To the extent that the Memorandum purports to authorize DOJ attorneys to disregard an ethical rule which has been adopted by this court pursuant to its Local Rules, the Memorandum instructs federal prosecutors to violate federal law. *See United States v. Klubock,* 832 F.2d 649, 651 (1st Cir.1986), reinstated, 832 F.2d 664, 665 (1st Cir.1987) (state ethical rule adopted by U.S. district court through its local rules becomes federal law); *Baylson v. Disciplinary Bd. of the Supreme Court of Pennsylvania,* 764 F.Supp. 328, 332 (E.D.Pa.1991), (state ethical rule adopted by a federal district court through local rules is a federal law).

B. *Factors Specific To This Case*

Although the government relies primarily on the Thornburgh Memorandum to justify the actions of the prosecutor in this case, it also points to several factors which it contends remove AUSA Lyons' conduct from the purview of Rule 2–100. First, the government maintains that Rule 2–100 explicitly exempts criminal investigations of all types. Second, the government suggests that Lyons' communication with Lopez was akin to a pre-indictment investigatory contact. Third, the government argues that the rule is irrelevant because defendant Lopez initiated the contact. Finally, the government contends that Lopez waived the rule and that the court, through

the actions of the Magistrate Judge, sanctioned this waiver. The court will address each of these arguments in turn.

■ The Discussion comment following Rule 2–100 states in part:

There are a number of express statutory schemes which authorize communications between a member and person who would otherwise be subject to this rule. These statutes protect a variety of other rights.... Other applicable law also includes the authority of government prosecutors and investigators to conduct criminal investigations, *as limited by relevant decisional law.*

State Bar of California, Rules of Professional Conduct, at 56–57 (emphasis added). The government suggests that, in light of the Discussion text, the prosecutor's conduct in this case is not governed by Rule 2–100. The court finds this argument unpersuasive.

First, the language cited by the government clearly is limited to those situations where existing authority allows for communication between a prosecutor and a represented individual in the absence of his or her attorney. As the above discussion demonstrates, the courts have been unanimous in prohibiting such communication after a represented individual has been indicted.

Moreover, as the government essentially takes the position that Rule 2–100 does not apply to either pre- or post-indictment investigations, the logical conclusion must be that Rule 2–100 simply does not apply to criminal cases. This position, however, is wholly unsupported by California case law and other relevant authority, which has explicitly and repeatedly found that the ethical prohibition is applicable to prosecutors in criminal cases. [36] *See, e.g., Triple A Machine Shop, Inc. v. State of California,*

---

**34.** Thornburgh, Foreword, *United States Department of Justice Legal Activities 1990–1991* at iii (1990).

**35.** *United States Department of Justice Legal Activities 1990–1991* at 1.

**36.** On May 27, 1989, Rule 7–103 of the California Rules of Professional Conduct was replaced

by Rule 2–100. Both rules contain the same ethical prohibition against communication with a represented individual in the absence of his or her attorney. The authority cited by this opinion in regard to the state rule addresses Rule 7–103, but is equally applicable to Rule 2–100.

213 Cal.App.3d 131, 139, 261 Cal.Rptr. 493 (1989) (rule prohibiting communication with represented individual in absence of opposing counsel applies to criminal as well as civil cases); *People v. Sharp*, 150 Cal. App.3d 13, 18, 197 Cal.Rptr. 436 (1983) (rule applies in pre-indictment criminal investigation); State Bar of California, Formal Opinion No. 1979–49 (rule applies to prosecutors).

*People v. Sharp* is especially instructive. In that case, the defendant was arrested and charged with bank robbery. At the behest of the district attorney, the police department put the defendant in a line-up in the absence of his retained counsel. 150 Cal.App.3d at 16, 197 Cal.Rptr. 436. The *Sharp* court, ruling that the police action violated the ethical prohibition against communication with a represented individual, stated:

> Because the prosecutor's position is unique—he represents authority and the discretion to make decisions affecting the defendant's pending case—his contact carries an implication of leniency for cooperative defendants or harsher treatment for the uncooperative. Such contact intrudes upon the function of defense counsel and impedes his or her ability to negotiate a settlement and properly represent the client, whose interests the rule is designed to protect. Hence, when the prosecutor in the instant case directed his agents to conduct the lineup without insuring that defense counsel was properly notified, he obtained evidence by means violative of his professional ethical responsibilities....

*Id.* at 18, 197 Cal.Rptr. 436.

In light of the authority discussed above, the court rejects the government's argument that Rule 2–100 does not apply in this case.

■ The court also has little difficulty rejecting the government's suggestion that the prosecutor's communication with Lopez was akin to pre-indictment investigation. Straining credulity, the government posits:

> [I]t is possible to view the communications in this case, at least in part, as occurring during the investigative stage. Lopez' proposal of cooperation was not focused on his own case; instead, he indicated that he and Escobedo could provide information on others not yet charged. If Lopez had not, at the moment, also been charged himself, this clearly would have been a communication during the investigative phase.

Gov. Simultaneous Brief at 8.

Although the government's argument is brazen, it is entirely unpersuasive. First, Lopez *was* under indictment at the time of his secret meetings with the government. Second, the record indicates that during those meetings Lyons pressured Lopez to provide information concerning the source of drugs in the transaction for which Lopez was charged. RT, 11/19/90, at 78–79; RT, 2/4/91, at 27; RT, 3/4/91, at 40–41; RT, 3/18/91, at 70–71. Finally, even if the court were to accept the government's fanciful argument, *Sharp* suggests that the ethical prohibition of the State Bar of California should be applied pre-indictment.

■ Nor is the prosecutor's conduct excused by the fact that the defendant initiated contact with the government. Courts have consistently ruled that the ethical prohibition bars a prosecutor from communicating with a represented individual without his or her counsel even if it is the individual who makes the first contact. *United States v. Partin*, 601 F.2d 1000, 1005 (9th Cir.1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980); *Suarez v. State of Florida*, 481 So.2d 1201, 1206 (Fla.1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2908, 90 L.Ed.2d 994 (1986); *People v. Green*, 274 N.W.2d at 452–53. The Discussion text following Rule 2–100 explicitly states that it is irrelevant whether an attorney is contacted by the opposing party.[37] In addition, the Committee on Professional Ethics of the ABA has unanimously ruled that the ethical prohibition is

---

**37.** The Discussion text states as follows:

Rule 2–100 also addresses the situation in which member A is contacted by an opposing party who is represented and, because of dissatisfaction with that party's counsel, seeks A's independent advice. Since A is employed by the opposition, the member cannot give independent advice.

violated even when the defendant initiates contact with the government. ABA Opinions of the Comm. on Prof. Ethics (1967), at 360. Moreover, as the ethical prohibition applies to attorneys and is designed in part to protect their effectiveness, a represented party may not waive it. *United States v. Thomas*, 474 F.2d at 112; *State v. Morgan*, 231 Kan. 472, 646 P.2d 1064, 1070 (1982).

■ Finally, the government is not saved by the intervention of the Magistrate Judge in this case. The record indicates that the Magistrate Judge was operating under the mistaken assumption that Lopez's attorney, Tarlow, was being paid by a third party with interests inimical to those of Lopez and that Lopez feared that if Tarlow became aware of his client's interest in cooperating with the government, he would pass the information on to others who would harm Lopez and/or his family. RT, 5/21/90, at 4, 5 and 7. AUSA Lyons testified that he communicated this theory to Judge Smith; the record makes clear, however, that the prosecutor had no evidence to support that theory and had been told explicitly by attorney Twitty that this was not the case. RT, 11/19/90, at 58–59; RT, 12/13/90, at 14; RT, 3/4/91, at 40, 74. Lyons never informed the court of Twitty's representation that Lopez feared Tarlow would withdraw from the case because of Tarlow's refusal to represent individuals who cooperate with the government.[38] Under these circumstances, the Magistrate Judge's actions are understandable.

As discussed above, the ethical prohibition contained in Rule 2–100 and DR 7–104 adheres to the attorney in question and may not be waived by a represented client. *See Thomas*, 474 F.2d at 112; *Morgan*, 646 P.2d at 1070. However, a difficult situation is created when a defendant belongs to a crime organization and his attorney is loyal to the organization rather than to the defendant. The defendant may fear for his safety if he chooses to cooperate with the government. State bars confronting this situation have ruled that such facts do not justify exempting prosecutors from the

ethical prohibition. Mich. State Bar Comm. on Prof. and Judicial Ethics, Op. 202 (April 5, 1965), *reprinted in* 46 Mich.St.B.J. 29 (May 1967); Ore.State Bar Op. 484 (March 1983). However, at least one bar has ruled that a prosecutor may arrange for an *ex parte* contact between the defendant and the court when the defendant will be endangered if his attorney becomes aware that the defendant wishes to cooperate with the government. Ore. State Bar Op. 484. As a result of representations made by the prosecutor in this case, Magistrate Judge Wilken clearly believed she was confronted with such a situation.

Moreover, rather than seeking to insulate its actions from attack by citing the Magistrate Judge's intervention, throughout the proceedings on the motion to dismiss the government has insisted on relying on the Thornburgh Memorandum in order to justify its conduct. In this sense, the case at bar is distinguishable from *United States v. Adonis*, where the government, facing an allegation that an Assistant United States Attorney had violated DR 7–104, wisely declined to invoke the Memorandum when the trial judge inquired regarding the Attorney General's policy. 744 F.Supp. 336, 347 (D.D.C.1990). In contrast, the government here has consistently held up the Thornburgh Memorandum as the *raison d'etre* for its actions.

In light of what has occurred in the instant case, the Magistrate Judge's intervention is of no help to the prosecution. Whether by design or otherwise, the government effectively misled the court concerning the circumstances surrounding Lopez's contact with the government. In any event, the government places its faith in the Thornburgh Memorandum, not in the actions of the Magistrate Judge, and it is thus the policy embodied in the Memorandum which is at the center of this case.

### C. *Separation of Powers*

■ Not content to argue that prosecutors are exempt from the ethical prohibition contained in Rule 2–100 and DR 7–104,

---

**38.** The Magistrate Judge did not question Lopez as to Tarlow's purported fee arrangement or any concerns he might have had for his safety or that of his family.

the government further contends that this court is barred by the separation of powers doctrine from enforcing its Local Rules, which adopt Rule 2–100 as the rule of this court. It is suggested that "[i]t is the Attorney General's prerogative to determine how Department of Justice attorneys exercise their statutory responsibility to investigate possible violations of criminal laws" and that, to the extent that a conflict exists between the Attorney General's policy and the rules adopted by this court, "the court may not interfere." Gov. Simultaneous Brief at 4. Once again, the government's position is patently without foundation.

There is no question that the separation of powers doctrine is vital to a healthy constitutional government. *Nixon v. Administrator of General Services,* 433 U.S. 425, 441–46, 97 S.Ct. 2777, 2789–92, 53 L.Ed.2d 867 (1977). However, this does not mean that the doctrine creates an inflexible rule. *Chadha v. Immigration and Naturalization Service,* 634 F.2d 408, 425 (9th Cir.1980). The separation of powers principle is violated when "the arrogation of excess and unwonted power is radical and unambiguous...." *Chadha,* 634 F.2d at 425. The Ninth Circuit has defined a constitutional violation of the separation of powers as "an assumption by one branch of powers that are central or essential to the operation of a coordinate branch, provided also that the assumption disrupts the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government." *Id.*

▇▇▇▇▇ The judiciary has been given the authority to police attorneys who appear before it.[39] *Cohen v. Hurley,* 366 U.S. 117, 123–124, 81 S.Ct. 954, 958–959, 6 L.Ed.2d 156 (1961); *Zambrano v. City of Tustin,* 885 F.2d 1473, 1479–80 (9th Cir.

1989). This includes the authority to adopt local rules necessary to carry out the business of the court. *Frazier v. Heebe,* 482 U.S. 641, 645, 107 S.Ct. 2607, 2611, 96 L.Ed.2d 557 (1987); *see also* 28 U.S.C. § 1654. The court's rulemaking power includes the power to make rules governing ethical matters in its forum. *Klubock,* 832 F.2d at 667.

Inherent in the court's power to make rules is the ability to enforce them. The Supreme Court has observed:

> The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judiciary power of the United States' would be a mere mockery."

*Young v. United States Ex rel. Vuitton Et Fils S.A.,* 481 U.S. 787, 796, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987) (quoting *Gompers v. Bucks Stove & Range Company,* 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911)).

The government's suggestion that this court may not enforce its Local Rules against DOJ attorneys because of some perceived conflict with those attorneys' statutory responsibility to investigate criminal investigations is, to put it bluntly, preposterous. DOJ attorneys may not be exempted from the court rules which every other attorney must obey. Like every attorney, an attorney for the United States appears before the court in a dual role. "He is at once an officer of the court and

---

**39.** The Department of Justice itself, in an *amicus* brief recently submitted to the Supreme Court, stated:

A lawyer is not in the same position as [sic] private citizen with respect to the judicial system. Rather, the lawyer has a "fiduciary obligation to the courts." ... [C]ourts have for centuries possessed authority "over members of the bar, incident to their broad responsibility for keeping the administration of justice

and the standards of professional conduct unsullied.... [L]awyers must operate ... as assistants to the court in search of a just solution to disputes."

Amicus Brief for the Department of Justice at 6, *Gentile v. State Bar of Nevada,* — U.S. —, 111 S.Ct. 669, 112 L.Ed.2d 662 (quoting *Cohen v. Hurley,* 366 U.S. 117, 123–24, 81 S.Ct. 954, 958–59, 6 L.Ed.2d 156 (1961)).

the agent and attorney for a client; in the first capacity he is responsible to the Court for the manner of his conduct of a case, i.e., his demeanor, deportment and ethical conduct...." *United States v. Chanen,* 549 F.2d 1306, 1313 n. 5 (9th Cir.1977), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977) (quoting *Newman v. United States,* 382 F.2d 479, 481 (D.C.Cir. 1967)).

■ When a court regulates a prosecutor's ethical conduct, it regulates the prosecutor in his capacity as an officer of the court and thus there is no threat to the principle of separation of powers. *See United States v. Herrera–Figueroa,* 918 F.2d 1430, 1434 (9th Cir.1990) (no threat to separation of powers when court exercises supervisory power to promulgate a rule regarding preparation of presentencing reports, since a probation officer is acting as an arm of the court in preparing the report); *see also United States v. Kilpatrick,* 821 F.2d 1456, 1479 (10th Cir.1987), *cert. granted* in part and *judgment aff'd* by *Bank of Nova Scotia v. United States,* 484 U.S. 1003, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988) (Seymour, J., dissenting) ("a prosecutor may not invoke separation of powers to avoid the consequences of his intentional disregard of *judicial standards* specifically directed toward his conduct.") (emphasis in the original). Indeed, the prosecutor owes a duty of good faith both to the court and to the defendant. *Chanen,* 549 F.2d at 1313 n. 5.

There is in fact no conflict between the DOJ attorney's statutory responsibilities to investigate and prosecute crimes and the court-adopted rule prohibiting communication with represented individuals in the absence of their attorneys. As the court has already indicated, there is no federal statute which authorizes government attorneys to engage in such communications. Thus the only conflict is that which exists between a particular Attorney General's policy and this court's Local Rules.

Moreover, the principle that local rules duly adopted by a U.S. district court are federal law is not foreign to the Department of Justice. Indeed, in a recent case involving a U.S. district court's local rules governing ethical conduct of prosecutors, the Department, apparently finding it to its advantage, took the position that local rules are federal laws and therefore supreme. *See Baylson,* 764 F.Supp. at 331. The very same Department that urged this position before the District Court in the Eastern District of Pennsylvania just months ago surely does not argue the opposite here.

■ As the Supreme Court pointed out in *Young,* a court's ability to enforce its own rules is essential to the judicial power of the court. The ethical prohibition embodied in California's Rule 2–100 and the ABA's DR 7–104 has been adopted in the Local Rules of U.S. District Courts throughout this country.[40] Some courts

---

**40.** District courts that have adopted the state of situs rules of professional responsibility, all of which include the ethical prohibition embodied in California Rule 2–100 and ABA DR 7–104, *supra* note 26, include:

Arizona (Rules 6(a) and 7(d)); California (C.D.Rule 2.51), (E.D.Rule 180(b), (e)), (N.D. Rule 110–3); Colorado (Rule 306 and Appendix A); Connecticut (Rule 3(a)); Delaware (Rules 8.2D(2) and I); Georgia (N.D.Rule 110–3); Idaho (Rule 1–107); Illinois (N.D.Rule 1(g)); Kansas (Rule 407); Kentucky (E.D. and W.D.Rule 3(b)(2)(E)); Louisiana (E.D., M.D. and W.D.Rule 20.04); Maine (Rule 5(d)); Massachusetts (Rule 83.6(4)(b)); Minnesota (Rule 83.6(d)); Missouri (E.D.Rule 2(G)); Nebraska (Rule 53); Nevada (Rule 8(a)); New Hampshire (Rule 4 (d)); New Mexico (Rule 83.9); North Carolina (E.D.Rule 2.10); Oklahoma (W.D.Rule 4(J)(4)); Oregon (Rule 110–3); Pennsylvania (M.D.Rule 304.2); Rhode Is-

land (Rule 4(d)); South Carolina (Rule 2.08); Tennessee (E.D.Rule 4.1); Utah (Rule 1(g), also adds Code of Professional Responsibility adopted by Judicial Conference of the United States); Vermont (Cv.Rule 1(IV)); Virginia (Rule 7(I)); Washington (E.D.Rule 1.2(f)(2)); West Virginia (N.D.Rule 1.05(a)).

District courts that have adopted the ABA rule or some version thereof include:

District of Columbia (DR 7–104); Florida (S.D.Rule 16.c), (N.D.Rule 4(g)(1) as modified by Florida rules), (M.D.Rules 2.02(b)(c) and 2.04(c) as modified by Florida rules); Georgia (S.D.Rule 5(d)); Hawaii (Rule 110–3); Indiana (S.D.Rule 1(f) as adopted by State of Indiana); Michigan (W.D.Rule 19(e)); New Jersey (Rule 6A); New York (N.D.Rule 4(f)); Oklahoma (E.D.Rule 4(j) also adds general proscription against unprofessional conduct), (N.D.Rule 4J also adds general proscription against unprofessional conduct); Tennessee

have seen fit to explicitly apply their rules to government attorneys.[41] The Attorney General's attempt to exempt DOJ attorneys from federal court rules is an arrogation of power essential to the functioning of the courts, and as such itself violates the separation of powers doctrine.[42] *Chadha* 634 F.2d at 425. *See also United States v. Adonis*, 744 F.Supp. 336, 347 n. 50 (D.D.C. 1990) (Thornburgh memorandum does not take precedence over the court's local rules).

The government's separation of powers argument thus fails. This court is empowered to enforce the rule prohibiting communication with represented individuals in the absence of their attorneys against government prosecutors.

## II. *Sixth Amendment*

■ Defendant Lopez contends that in addition to transgressing Rule 2–100 and DR 7–104, the government has violated his sixth amendment right to chosen counsel. The government argues that there is no constitutional right to chosen counsel and that if there is such a right, it was not violated in this case. The prosecution further maintains that, in any event, Lopez waived his sixth amendment rights.

■ Government interference with a defendant's relationship with his attorney may render that attorney so ineffective as to violate the defendant's sixth amendment right to counsel. *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir.1980). However, not all government action which arguably interferes with the attorney-client relationship violates the sixth amendment. *Irwin*, 612 F.2d at 1185. Where a defendant is not prejudiced, there is no sixth amendment violation. *Id.* at 1186; *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir.1985), *cert. denied*, 475 U.S. 1088, 106 S.Ct. 1474, 89 L.Ed.2d 729 (1986). Prejudice may manifest itself in several ways, including destruction of the attorney-client relationship. *Irwin*, 612 F.2d at 1187, 1188–89.

■ Contrary to the government's assertions, criminal defendants who can afford to retain counsel have a qualified right to chosen counsel under the sixth amendment. *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir.1986). "The right to choose one's own counsel is an essential component of the Sixth Amendment because, were a defendant not provided the opportunity to select his own counsel at his own expense, substantial risk would arise that the basic trust between counsel and client, which is a cornerstone of the adver-

(M.D.Rule 1(e)(4)), (W.D.Rule 1(c)); West Virginia (Rule 1.02(h) also adds Model Rules of Professional Responsibility);

Some districts have adopted the Uniform or Model Federal Rules of Disciplinary Enforcement, which in turn incorporate the Code of Professional Responsibility of the highest court of the state in which the adopting district is located. These districts include:

Arkansas (Rule 2e); Illinois (Rule 33); Maryland (Rule 705); Michigan (Appendix); Ohio (S.D.Rule 2.6 and Appendix Order 81–1); Pennsylvania (E.D.Rule 14), (M.D.Chapter III); Puerto Rico (Rule 211); Texas (Appendix A to Rules); Vermont (Rule 1D); Wyoming (Rules 301–312).

**41.** Included among the districts which explicitly apply their Local Rules to government attorneys are: Alabama (N.D., S.D., M.D.); California (E.D. and S.D.); Florida (M.D.); Guam; Kansas; Michigan (W.D.); Nevada; and Utah.

**42.** None of the cases cited by the government in support of its separation of powers argument are on point. For example, in *United States v. Chanen*, the Ninth Circuit ruled that the trial court had overstepped the bounds of its authority by interfering with a "standard prosecutorial decision"—what evidence to present to the grand jury and the manner in which to present it. 549 F.2d at 1313. The *Chanen* court pointed out that it was not clear that the prosecutor's actions in the case infringed either on the preservation of judicial integrity or fundamental fairness. *Id.* In *United States v. Cox*, the Fifth Circuit reversed a lower court, which found a U.S. Attorney in contempt of court for failing to obey the court's order that he indict an individual; the court pointed out that it is in the U.S. Attorney's sole discretion to determine whom to indict. 342 F.2d 167, 171–72 (5th Cir.), *cert. denied*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). *Newman v. United States*, 382 F.2d 479, 480 (D.C.Cir.1979) and *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir.), *cert. denied*, 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 322 (1983), are similarly inapposite.

sary system, would be undercut." *Linton v. Perini*, 656 F.2d 207, 209 (6th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982). At the same time, the right is not absolute and will give way where its realization would undermine public confidence in the integrity of the legal system. *Washington*, 797 F.2d at 1465. The *Washington* decision suggests that the right to chosen counsel is not to be denied lightly. *Id.* at 1466 (court may not dismiss defendant's chosen counsel because of a general concern regarding public confidence in judicial integrity).

While a criminal defendant thus has a qualified right to chosen counsel, that right is not independent of the right guaranteed by the sixth amendment itself. "[I]n evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697 (quoting *United States v. Cronic*, 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984)). Thus, while the courts have recognized a criminal defendant's right to choose counsel, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.*

In the case at bar, the government conducted secret meetings with defendant Lopez and concealed them from Lopez's lawyer, Barry Tarlow. Prior to the secret meetings, the government falsely suggested to the court that the contacts were justified because Tarlow was being paid by a third party who could do harm to Lopez and his family, were Lopez to cooperate with the government. While the government may have intended that Tarlow never learn of these meetings, particularly if he was to continue to represent Lopez, the prosecutor nonetheless informed Tarlow's co-counsel, Harold Rosenthal, who in turn notified Tarlow. Not surprisingly, Tarlow withdrew his appearance as counsel of record for Lopez. Tarlow subsequently filed complaints against AUSA Lyons and co-counsel Twitty with the bars of which they are members.

It is thus no exaggeration to say that the conduct of the government in this case cost the defendant his lawyer. The record makes it clear that Lopez retained Tarlow and wished to be represented by him if his case proceeded to trial. The government made that impossible.

As the Supreme Court made clear in *Wheat*, however, this does not end the inquiry. In fact, subsequent to Tarlow's withdrawal from the case, Lopez found new counsel. There is no question that Lopez's new counsel is very able and will provide him with outstanding representation. Therefore, in light of the dictates of *Wheat*, this court is compelled to find that the government misconduct at issue here does not constitute a sixth amendment violation.[43]

### III. *Remedy*

Having ruled that the government has violated the ethical prohibition contained in Rule 2–100 and DR 7–104, the court must now determine what remedy, if any, is appropriate.

Defendant Lopez has moved the court to dismiss his indictment. Dismissal of an indictment for government misconduct is an extreme remedy which should be used infrequently. *United States v. Rogers*, 751 F.2d 1074, 1076–77 (9th Cir.1985); *Irwin*, 612 F.2d at 1186 n. 10. Therefore, an indictment will be dismissed only where the government misconduct was both flagrant and prejudiced the defendant. *Unit-*

---

**43.** The Government should take little solace from the conclusion the court has reached on this issue. Indeed, the sixth amendment was not violated in this instance *only* because of the fortuity that Lopez was able to obtain capable new counsel. The Government and the courts swim in dangerous waters when a defendant's constitutional rights rest on such thin reeds. As the Supreme Court has pointed out, "[p]ersonal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction." *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975).

*ed States v. Jacobs*, 855 F.2d 652, 655 (9th Cir.1988); *United States v. Carrasco*, 786 F.2d 1452, 1455 (9th Cir.1986). "Sparing use, of course, does not mean no use. Even 'disfavored remedies' must be used in certain situations." *United States v. Omni Int'l Corp.*, 634 F.Supp. 1414, 1438 (D.Md.1986) (dismissal warranted due to serious government misconduct at pre- and post-indictment stages).

 A court may dismiss an indictment for prosecutorial misconduct either on constitutional grounds or by exercising its supervisory powers; the bases for the court's analysis will differ accordingly. *Carrasco*, 786 F.2d at 1455. A sixth amendment violation does not necessarily result in dismissal of an indictment. *Rogers*, 751 F.2d at 1078. Because the sixth amendment right to counsel is meant to assure fairness in the adversarial criminal process, there is no basis for imposing a remedy based on a sixth amendment violation unless "the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense." *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981); *United States v. McClintock*, 748 F.2d 1278, 1284 (9th Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985). The Ninth Circuit has interpreted *Morrison* as allowing dismissal for a sixth amendment violation only when the prejudice to the defendant is so great that it impairs his or her ability to mount a defense at trial. *Rogers*, 751 F.2d at 1078, 1079.

As it has already been determined that there is no sixth amendment violation at issue here, the court now turns to a discussion of the supervisory power.

In contrast to constitutional grounds for dismissal, the supervisory power theory "is premised on the inherent ability of the federal courts to 'formulate procedural rules not specifically required by the Constitution or the Congress.'" *McClintock*, 748 F.2d at 1284 (quoting *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983)). A court's su-

pervisory power permits the court to supervise the administration of criminal justice. *Id.*

The Supreme Court first recognized the supervisory power in *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). The *McNabb* court found that police officers who held and interrogated a suspect for two days without assistance of counsel violated procedural requirements, approved by Congress, which mandated that an arrestee be brought before a judicial officer as soon as possible. *McNabb*, 318 U.S. at 342, 63 S.Ct. at 613–14. The Court, exercising its supervisory power, reversed McNabb's conviction and ruled that evidence obtained by authorities during the interrogation of McNabb was to be excluded. With regard to the newly-recognized supervisory power, the Court observed:

> Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as 'due process of law' and below which we reach what is really trial by force.

*Id.* at 340, 63 S.Ct. at 613.

Supreme Court decisions following on the heels of *McNabb* utilized the supervisory power to vindicate the Court's interest in judicial integrity, as distinct from its duty to enforce the rights of litigants. For example, in *Thiel v. Southern Pacific Company*, the Court ruled that it was improper to exclude daily wage earners from jury service. 328 U.S. 217, 225, 66 S.Ct. 984, 988, 90 L.Ed. 1181 (1946). In reaching its decision, the Court focused on the undermining and weakening of the institution of the jury trial and found it unnecessary to determine if the defendant had been prejudiced. *Thiel*, 328 U.S. at 224, 66 S.Ct. at 987–88. Similarly, in *Ballard v. United States*, the Court, in ruling against the exclusion of women from juries, exercised its supervisory power to "vindicate appropriate standards of judicial administration."

329 U.S. 187, 197, 67 S.Ct. 261, 266, 91 L.Ed. 181 (1946).

As *McNabb* and its progeny make clear, the use of the supervisory power, to dismiss an indictment or for any other purpose, does not require a constitutional violation. *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir.1983). The supervisory power may be used not only to vindicate a defendant's rights, but also to preserve judicial integrity and/or to deter illegal or improper conduct. *United States v. Hasting*, 461 U.S. at 505, 103 S.Ct. at 1978; *Carrasco*, 786 F.2d at 1455. Indeed, the primary purpose of the supervisory power is to protect the legitimate institutional interests of the federal courts. "[S]upervisory powers are intended to deter governmental misconduct and protect the integrity of the judicial process, while constitutional analysis preserves fairness for the individual defendant." *United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir.1991) (Nelson, J., concurring).

In light of the primary emphasis placed on vindicating the recognizable institutional goals of the courts, it should come as no surprise that the supervisory power has frequently been used by federal courts as a means of sanctioning and deterring prosecutorial misconduct.[44] "An important function of our supervisory power is to guarantee that federal prosecutors act with due regard for the integrity of the administration of justice." *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir.1974) (Hufstedler, J., concurring).

It is well-established that a federal court may use its supervisory power to dismiss an indictment on the basis of government misconduct. *United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978). "As such, dismissal is used as a prophylactic tool for discouraging future deliberate government impropriety of a similar na-

ture." *Id.; see also United States v. Samango*, 607 F.2d 877 (9th Cir.1979) (court uses supervisory power to dismiss indictment where cumulative effect of errors and prosecutorial misconduct was to produce a biased grand jury); *United States v. Isgro*, 751 F.Supp. 846, 851 (C.D.Cal.1990) (court dismisses indictment because of prosecutorial misconduct before grand jury).

"Under their supervisory power, courts have substantial authority to oversee their own affairs to ensure that justice is done." *Simpson*, 927 F.2d at 1089. As the Ninth Circuit recently recognized in *Simpson*, government misconduct which violates a federal statute, the Constitution or a procedural rule may threaten judicial integrity and thus require exercise of the supervisory power. *Id.* at 1090–91. Clearly a court's supervisory power may also be invoked in response to the violation of court rules governing attorney ethics, especially when those rules have been violated by government attorneys. Indeed, the supervisory power doctrine was developed in large part in response to instances of government misconduct which threatened judicial integrity. *See, e.g., McNabb*, 318 U.S. at 340–42, 63 S.Ct. at 612–14; *Samango*, 607 F.2d at 884; *Basurto*, 497 F.2d at 793.

While the court may use its supervisory power to dismiss an indictment, dismissal is, generally speaking, a disfavored remedy. *Rogers*, 751 F.2d at 1076. For this reason, a court may dismiss an indictment only in "flagrant" cases of prosecutorial misconduct. *Jacobs*, 855 F.2d at 655; *Carrasco*, 786 F.2d at 1455. The Ninth Circuit has conceded that this standard is so vague that "it fails to illuminate the applicable legal principles, and provides district judges who are called upon to apply it precious little guidance." *U.S. v. Sears, Roebuck & Co.*, 719 F.2d 1386, 1391 n. 6

---

**44.** The supervisory power has been used by courts in many contexts, including to reverse a conviction supported by false evidence, *Mesarosh v. United States*, 352 U.S. 1, 14, 77 S.Ct. 1, 8, 1 L.Ed.2d 1 (1956); to punish improper practices by federal attorneys, *United States v. Hale*, 422 U.S. 171, 180 & n. 7, 95 S.Ct. 2133, 2138 & n. 7, 45 L.Ed.2d 99 (1975); *United States v. Banks*, 383 F.Supp. 389 (D.S.D.1974), *appeal dismissed sub nom., United States v. Means*, 513 F.2d 1329 (8th Cir.1975); and to suppress evidence government agents gained through misconduct. *Mallory v. United States*, 354 U.S. 449, 453, 77 S.Ct. 1356, 1358–59, 1 L.Ed.2d 1479 (1957); *Rea v. United States*, 350 U.S. 214, 217, 76 S.Ct. 292, 294, 100 L.Ed. 233 (1956).

(9th Cir.1983). For this reason, courts must determine on a case-by-case basis when government misconduct has placed the integrity of the criminal justice system in jeopardy. *United States v. De Rosa,* 783 F.2d 1401, 1406 (9th Cir.1986), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

■ To warrant dismissal, the government's misconduct must not only be flagrant, but also must prejudice the defendant. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 2373–74, 101 L.Ed.2d 228 (1988). As the Supreme Court pointed out in *Bank of Nova Scotia,* "where the error is harmless, concerns about the 'integrity of the [judicial] process' will carry less weight." *Id.* at 255, 108 S.Ct. at 2374 (quoting *United States v. Hasting,* 461 U.S. at 506, 103 S.Ct. at 1979).

■ While the Supreme Court has made clear that a defendant must be prejudiced by government misconduct in order for an indictment to be dismissed through the supervisory power, this court is not convinced that the prejudice a defendant suffers must rise to the level required to warrant dismissal on constitutional grounds. Because the sixth amendment right to counsel is meant to guarantee fairness in the criminal adversarial process, dismissal for a sixth amendment violation is not warranted unless the fairness of that process has been compromised. *Morrison,* 449 U.S. at 365, 101 S.Ct. at 668; *Rogers,* 751 F.2d at 1078, 1079. If the interests which the sixth amendment is designed to protect are not compromised, the extreme remedy of dismissal is not justified.

■ The court's supervisory power, on the other hand, exists principally to allow the court to protect the integrity of the judicial process and to deter government

misconduct. *Hasting,* 461 U.S. at 505, 103 S.Ct. at 1978; *Simpson,* 927 F.2d at 1091 (Nelson, J., concurring); *Carrasco,* 786 F.2d at 1455. Therefore, the defendant's ability to receive a fair trial is not the primary consideration in the court's decision as to whether it should exercise its supervisory power when confronted with flagrant government misconduct.[45] Instead, the decision to dismiss an indictment on grounds of government misconduct must be based largely on the court's assessment that dismissal is necessary to protect the integrity of the judicial process and to deter future misconduct. *Simpson,* 927 F.2d at 1091 (Nelson, J., concurring) ("Dismissal on supervisory grounds is based on a combination of the egregiousness of a prosecutor's present misconduct, the need to discipline him for past misconduct, and the effectiveness of any other available sanctions short of dismissal."); *United States v. Gonzalez,* 800 F.2d 895, 899 (9th Cir.1986) (government misconduct warrants dismissal only when the misconduct represents a serious threat to the integrity of the judicial process).

In determining if the government misconduct at issue is sufficiently egregious to warrant dismissal, courts have been guided by two important considerations. First, courts frequently have looked to whether there is a pattern of similar government misconduct, on the theory that such widespread misconduct increases the threat to judicial integrity. *United States v. Griffith,* 756 F.2d 1244, 1249 (6th Cir.1985), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985) (court may not order dismissal under its supervisory power unless prosecutorial misconduct at issue is a long-standing or common problem); *United States v. Rosenfield,* 780 F.2d 10, 11 (3d Cir.1985), *cert. denied* 478 U.S. 1004, 106

---

**45.** Indeed, prior to the Supreme Court's decision in *Bank of Nova Scotia,* courts were split as to whether any prejudice at all was needed in order for a court to exercise its supervisory power to dismiss an indictment because of government misconduct. Prejudice required: *United States v. Owen,* 580 F.2d 365, 367–68 (9th Cir.1978); *United States v. Kouba,* 822 F.2d 768, 774 (8th Cir.1987); *United States v. McKenzie,*

678 F.2d 629, 631 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982). Prejudice not required: *United States v. Hogan,* 712 F.2d 757, 761 (2d Cir.1983); *United States v. Serubo,* 604 F.2d 807, 817 (3d Cir.1979); *United States v. McCord,* 509 F.2d 334, 349 (D.C.Cir. 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

S.Ct. 3294, 92 L.Ed.2d 709 (1986) (prosecutorial misconduct warrants dismissal where misconduct challenged has become "entrenched and flagrant"); *United States v. Brown*, 602 F.2d 1073, 1077 (2d Cir.1979), *cert. denied*, 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979) (dismissal warranted only where the course of official conduct is a "demonstrated, long-standing" one and when the pattern of misconduct is "widespread" or "continuous").

█ Second, courts have looked to whether there is any alternative remedy which the court may use to preserve judicial integrity and deter future government misconduct. *Bank of Nova Scotia*, 487 U.S. at 255, 108 S.Ct. at 2374 (deterrence an inappropriate basis for reversal where means more narrowly tailored to deter objectionable prosecutorial misconduct are available); *Simpson*, 927 F.2d at 1091 (Nelson, J., concurring) (in considering whether to dismiss an indictment based on government misconduct, court must consider the effectiveness of any other available sanctions short of dismissal). If there is an effective alternative remedy, the extreme remedy of dismissal is not justified.

Turning to the case at bar, this court has no difficulty in finding that the government misconduct at issue here was egregious and flagrant. An Assistant United States Attorney twice met with a represented and indicted defendant in a criminal case and concealed those meetings from the defendant's attorney. The prosecutor's actions constituted an intentional violation of the long-standing ethical prohibition, adopted by this court's Local Rules, which categorically proscribes contacts between a prosecutor and a represented defendant without the knowledge and consent of the defendant's attorney.

What is worse, the prosecutor's actions are not those of a renegade. Instead, AUSA Lyons relied on a memorandum from the Attorney General which instructs attorneys of the Department of Justice to disregard the ethical rule concerning contact with represented individuals, regardless of whether the rule has been adopted by a court as its own. The court can conceive of few forms of government misconduct which could pose a greater threat to the integrity of judicial proceedings than a directive from the executive branch instructing its employees to disregard a rule duly adopted by the courts. Indeed, the very basis of the court's supervisory power to oversee the administration of criminal justice is the court's inherent authority to enact rules not required by the Congress or Constitution. *Hasting*, 461 U.S. at 505, 103 S.Ct. at 1978. The Attorney General, with little in the way of instruction, now purports to authorize assistant U.S. attorneys to determine when they need heed such rules.[46]

To the extent that the Thornburgh Memorandum provides some minimal guidance to DOJ attorneys by appearing to suggest that the ethical rule should be disregarded in the limited contexts of corporate and organized crime cases in which the principal target of investigation pays for legal representation of subordinates, this limitation was lost on AUSA Lyons. The prosecutor had absolutely no evidence to suggest that the defendant's attorney was being paid by an organized crime ring, RT, 12/13/91, at 14; indeed he had been explicitly told that this was not the case. RT, 3/4/91, at 39, 40, 74; RT, 3/18/91, at 76; Second Lyons Decl. ¶ 19. Nonetheless the prosecutor proceeded with the contacts with defendant Lopez. While AUSA Lyons sought the intervention of the court prior to communicating with defendant Lopez, he misinformed the court as to the circumstances surrounding the defendant's desire to speak with the government. RT, 11/19/80, at 58.

---

**46.** Although the Thornburgh Memorandum is restricted to the ethical rule banning communication between an attorney and a represented opposing party, there is absolutely no reason why its rationale may not be applied to *any* rule adopted by a court. The logic of the Attorney General's policy suggests that, whenever the Department of Justice determines that a Department attorney's duty to investigate and prosecute crimes is in any way impaired by a court rule, that court rule may be disregarded.

The Thornburgh Memorandum is nothing less than a frontal assault on the legitimate powers of the court. The actions of the prosecutor in this case, rather than alleviating the nefariousness of that assault, serve to graphically illustrate the dangers of the Attorney General's policy.

Just as the government misconduct in this case must be characterized as egregious and flagrant, the court has no difficulty in finding that defendant Lopez was substantially prejudiced by that misconduct. As the court has already indicated, the prosecutor's conduct ultimately served to deprive Lopez of his chosen counsel. The record indicates that Lopez, who retained Barry Tarlow because of his skills as a trial attorney, went to great lengths to avoid just this result. RT, 3/4/91, at 26, 38, 60. In light of the strong emphasis that this Circuit and others have placed on the right to choice of counsel, *U.S. v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986), *Wilson v. Mintzes*, 761 F.2d 275, 279 n. 5 (6th Cir.1985), *Linton*, 656 F.2d at 209, it is not for this court to determine that a defendant is not prejudiced when he loses his chosen counsel due to government misconduct.

Having found that the government engaged in flagrant and egregious misconduct and that the defendant was prejudiced by this misconduct, the court now turns to those additional factors which are to be weighed in deciding if the indictment should be dismissed. With regard to whether the actions of the government here represent a widespread and continuous problem, there can be no mistake. The Thornburgh Memorandum advises DOJ attorneys to disregard an ethical prohibition adopted by U.S. District Courts across the land. The government misconduct at issue is thus the result of an explicit policy of the Attorney General of the United States which promises to wreak havoc in federal trial courts everywhere. The Department of Justice is vigorously promoting the poli-

cy [47] and cases similar to this one are now before other federal trial courts.[48] The misconduct spawned by the Thornburgh Memorandum represents a serious threat to the integrity of criminal justice proceedings in federal courts; the threat will continue as long as the Attorney General's policy remains in force.

The court also must consider whether means more narrowly tailored to deter the government misconduct at issue here are available. *Bank of Nova Scotia*, 487 U.S. at 255, 108 S.Ct. at 2374; *Hasting*, 461 U.S. at 506, 103 S.Ct. at 1979. Courts have identified several remedies short of dismissal which may effectively deter government misconduct in some circumstances. These include suppression of the evidence obtained through the government misconduct, *Hammad*, 858 F.2d at 842; holding the prosecutor in contempt of court, *United States v. Vetere*, 663 F.Supp. 381, 386 (S.D.N.Y.1987); referring the prosecutor to the state bar for disciplinary proceedings, *Suarez*, 481 So.2d at 1206, 1207; verbal admonition of the prosecutor, so as to expose him or her to public opprobrium, *United States v. Serubo*, 604 F.2d 807, 818 (3d Cir.1979); and requesting that the Department of Justice take action against the prosecutor where the court finds misconduct. *United States v. Myers*, 510 F.Supp. 323, 328 (E.D.N.Y.1980).

The court finds that none of these alternative remedies would in any way deter government attorneys from continuing to pursue the dictates of the Thornburgh Memorandum and thus engaging in prosecutorial misconduct. First, suppression is clearly not an effective remedy in a case such as this. While AUSA Lyons represented to Judge Smith, during his *in camera* communication with the court, that Lopez was interested in speaking with the government regarding a possible disposition of the charges, the record makes clear

---

**47.** *See* Thornburgh, *Ethics and The Attorney General: The Attorney General Responds,* 74 Judicature 290 (April–May 1991); *Exercise Of Federal Prosecutorial Authority In A Changing Legal Environment: Hearing Before The Government Information, Justice, And Agriculture Subcom-* mittee Of The House Committee On Government Operations, 101st Cong., 2d Sess. (1990).

**48.** Glaberson, *Thornburgh Policy Leads to a Sharp Ethics Battle,* N.Y. Times, Mar. 1, 1991, at Bll, col. 3.

that the goal of the prosecutor was not to obtain evidence against the defendant himself but to win the defendant's cooperation in the investigation of a drug source. The secret meetings between the government and Lopez were "off the record" to encourage the defendant to cooperate; the information Lopez provided to the government consisted of a name or names of individuals purportedly involved in drug trafficking. The Thornburgh Memorandum's emphasis on pursuing criminal investigations and obtaining cooperation from individuals in organized crime cases suggests that suppression will be an irrelevant remedy in many of the cases which arise as a result of the Attorney General's policy.

Nor does the court find it appropriate to hold the prosecutor in contempt of court or to refer the prosecutor to the state bar for disciplinary proceedings.[49] While the court has found egregious and flagrant government misconduct in this case, it also recognizes that AUSA Lyons was following the dictates of a policy pronounced by the Attorney General. Under these circumstances, punishing the prosecutor with either contempt or referral to the state bar for disciplinary proceedings would be unfair to Lyons and would deflect attention from those responsible for the policy itself.[50]

The court is deeply skeptical about the deterrent effect of verbally admonishing the prosecutor or the Government in this case. The Thornburgh Memorandum has been roundly and publicly condemned by legal ethics experts, the American Bar Association, numerous state bars, and mem-

bers of Congress [51], all to no effect. There is no reason to believe that one more admonishment is likely to deter the Department of Justice from continuing to espouse prosecutorial misconduct through the Thornburgh Memorandum. Judge Frank long ago made the following observation:

> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the [prosecutor] here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable.... If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it.... Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking.

*United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 661 (2d Cir.) (Frank, J., dissenting), *cert. denied* 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946). *See also Serubo,* 604 F.2d at 817–18 (judicial "tongue clicking" unlikely to reduce flow of prosecutorial misconduct cases). In light of the Thornburgh Memorandum, the court finds Judge Frank's commentary particularly apt.

Finally, it cannot realistically be expected that the Department of Justice would institute disciplinary proceedings against an Assistant U.S. Attorney who engaged in prosecutorial misconduct by following a policy directive issued by the Attorney General. Indeed, Attorney General Thornburgh has

---

**49.** The record indicates that Lopez's former attorney, Barry Tarlow, has filed a complaint against AUSA Lyons with the Arizona State Bar, of which Lyons is a member.

**50.** The same does not hold true, however, for attorney Twitty. Twitty was not complying with the Attorney General's policy when he facilitated the intentional violation of Rule 2–100 and the Local Rules of this court. For this reason, the court finds it appropriate to refer Twitty to the State Bar of California for possible disciplinary proceedings.

**51.** *See* Glaberson, N.Y. Times, Mar. 1, 1991, at B11, col. 3; Norton, *Ethics and the Attorney General,* 74 Judicature 203 (December–January 1991); Prepared Statement of Professor Samuel

Dash, Director, Institute of Criminal Law and Procedure, Georgetown University Law Center, submitted to House Government Operations Committee, May 10, 1990; Prepared Statement of William W. Taylor III, American Bar Association, submitted to House Government Operations Committee, May 10, 1990; Brief of Amicus Curiae, National Association of Criminal Defense Lawyers, Ex. 6 (Report, American Bar Association); *Exercise Of Federal Prosecutorial Authority In A Changing Legal Environment: Hearing Before The Government Information, Justice, And Agriculture Subcommittee Of The House Government Operations Committee,* 101st Cong., 2d Sess. (1990).

recently affirmed the Department's intention to "stand by" federal prosecutors who violate DR 7–104 and its equivalents in conformance with the Attorney General's policy.[52]

Moreover, recent history suggests that the Department of Justice is not at all conscientious about disciplining those Department attorneys who engage in misconduct *without* the cover of official policy. A Congressional committee, conducting an investigation into the use and abuse of federal prosecutorial authority, recently asked the Department of Justice to report on what disciplinary action had been taken in ten cases in which federal courts found prosecutorial misconduct by assistant U.S. Attorneys.[53] The Department reported that it had taken no disciplinary action in any of the ten cases, leading the Congressional committee to observe:

> [R]epeated findings of no misconduct, and the Department's failure to explain its disagreements with findings of misconduct by the Courts raises serious questions regarding what the Department considers 'prosecutorial misconduct ... within the meaning of either the Code of Professional Responsibility or the Standards of Conduct in the Department of Justice ...'[54]

In light of the above discussion, the court finds that there are no remedies other than dismissal which are likely to serve as an effective deterrent to the type of government misconduct which occurred in this case.

CONCLUSION

Relying on a faulty and tortured reading of existing authority, the Attorney General has issued a policy directive instructing attorneys of the Department of Justice to disregard a fundamental ethical rule embraced by every jurisdiction in this country. In the case at bar, the Attorney General's policy resulted in both the intentional disregard of the court's Local Rules by an Assistant United States Attorney and the loss by defendant of his counsel of choice. The Department of Justice, invoking the separation of powers doctrine, now seeks to render the court powerless to enforce its own rules and to protect the integrity of the criminal justice system.

This court will not allow the Attorney General to make a mockery of the court's constitutionally-granted judicial powers. *Young,* 481 U.S. at 796, 107 S.Ct. at 2131. The title U.S. Attorney does not give the prosecutor a "'hunting license exempt from ethical constraints of advocacy.'" *United States v. Beckett,* 706 F.2d 519, 521 n. 5 (5th Cir.1983) (quoting *United States v. Bursten,* 453 F.2d 605, 610–11 (5th Cir. 1971), *cert. denied,* 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1974)). If anything, government prosecutors owe a higher duty to the court and the criminal justice system. "The U.S. Attorneys are entrusted with a unique role that includes 'the duty to protect the interests of all people, including, of course, the legitimate rights of those accused of crime in the federal courts.'" *McClintock,* 748 F.2d at 1285 (quoting *United States v. Butler,* 567 F.2d 885, 894 (9th Cir.1978) (Ely, J., concurring)). At a minimum, this means that government prosecutors must scrupulously obey ethical rules adopted by the court.

This court, mindful of the public's strong interest in the completion of criminal prosecutions, has carefully considered the

---

**52.** Thornburgh, 74 Judicature at 290.

**53.** H.R.Rep. No. 986, 101st Cong., 2d Sess., at 23 (1990). The ten cases cited by the House Subcommittee on Government Information, Justice, and Agriculture were: *United States v. Sawyer,* 799 F.2d 1494 (11th Cir.1986), *cert. denied,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1989); *United States v. Dougherty,* 810 F.2d 763 (8th Cir.1987); *United States v. Skarda,* 845 F.2d 1508 (8th Cir.1988); *United States v. Doe, et al.,* 860 F.2d 488 (1st Cir.1988); *United States v. Eder,* 836 F.2d 1145 (8th Cir.1988); *Bank of*

*Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Pacheco–Ortiz,* 889 F.2d 301 (1st Cir. 1989); *United States v. Martinez,* 894 F.2d 1445 (5th Cir.1990), *reh'g denied,* 901 F.2d 1110, *cert. denied,* —— U.S. ——, 111 S.Ct. 351, 112 L.Ed.2d 315 (1990); *United States v. Shuck,* 705 F.Supp. 1177 (N.D.W.Va.1989), *judgment rev'd,* 895 F.2d 962 (4th Cir.1990); and *United States v. Miller,* No. 88–8812 (S.D.Fla.1989).

**54.** H.R.Rep. No. 986 at 25.

factors weighing against dismissal.[55] Indeed, it is only the perilous threat that the Attorney General's policy poses to the court's constitutional powers and to the integrity of the criminal justice system that has moved the court to consider so extreme a remedy. Nonetheless, the court is convinced that no remedy short of dismissal will have any significant deterrent effect on future government misconduct of the type found in this case.

Therefore, the court hereby exercises its supervisory power and DISMISSES the indictment of Jose Orlando Lopez.

IT IS SO ORDERED.

**55.** The court notes that none of the factors weighing against dismissal which the Supreme Court identified in *Hasting,* 461 U.S. at 507, 103 S.Ct. at 1979, are present in the case at bar.